# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77044-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| KENNETH A. WARD, | ) | PUBLISHED OPINION |
| | ) | |
| Petitioner. | ) | FILED: April 8, 2019 |
| | ) | |

MANN, A.C.J. — Washington recognizes a common law necessity defense. The defense may be raised when a defendant demonstrates that they reasonably believed the commission of the crime was necessary to avoid or minimize a harm, the harm sought to be avoided was greater than the harm resulting from a violation of the law, the threatened harm was not brought about by the defendant, and no reasonable legal alternative existed.

Kenneth Ward appeals his conviction for burglary in the second degree after he broke into a Kinder Morgan pipeline facility and turned off a valve, which stopped the flow of Canadian tar sands oil to refineries in Skagit and Whatcom Counties. Ward intended to protest the continued use of tar sands oil, which he contends significantly

contributes to climate change, and the inaction by governments to meaningfully address the crisis of climate change. Ward argues that he was deprived of his Sixth Amendment right to present his only defense—necessity—after the trial court granted the State's motion in limine excluding all testimony and evidence of necessity.[1] We agree and reverse.

I.

Kinder Morgan transports tar sands oil from Canada into the United States by pipeline. On October 11, 2016, Kinder Morgan was notified by telephone that persons "would be closing a valve, one of our main line valves in the Mount Vernon area within the next 15 minutes." Following the call, Ward cut off a padlock and entered the Kinder Morgan pipeline facility off of Peterson Road in Burlington. Ward then closed a valve on the Trans-Mountain pipeline and placed sunflowers on the valve. At the same time, other protesters closed similar valves in North Dakota, Montana, and Minnesota. Collectively, the protests temporarily stopped the flow of Canadian tar sands oil from entering into the United States.

Ward was arrested at the pipeline facility and charged with burglary in the second degree, criminal sabotage, and criminal trespass in the second degree. Ward admitted his conduct but argued that his actions were protected under a necessity defense. The trial court granted the State's pretrial motion in limine to preclude all witnesses and evidence offered in support of Ward's necessity defense.

---

[1] Ward also argues that the trial court erred in refusing to instruct the jury on a necessity defense. Because we conclude that the trial court violated Ward's constitutional right to present a defense, we reverse and remand for a new trial. Therefore, we do not address whether the trial court also erred in rejecting Ward's jury instruction.

Ward's first trial ended with a hung jury. The State then recharged Ward with burglary in the second degree and criminal sabotage. Ward moved for reconsideration of the trial court's order granting the State's motion in limine. In support of his motion, Ward offered argument, the curriculum vitae for eight proposed expert witnesses, and voluminous scientific evidence documenting the impacts of climate change, that climate change is primarily caused by greenhouse gas emissions resulting from human activity, and the contribution of burning tar sands oil. The trial court denied Ward's motion for reconsideration and excluded all testimony and evidence in support of Ward's necessity defense. A second jury found Ward guilty of burglary but were unable to return a verdict on criminal sabotage. Ward appeals.

## II.

Ward argues that the trial court denied his constitutional right to present a defense by granting the State's motion in limine striking all testimony and evidence of necessity. We agree.

We review a claim of a denial of Sixth Amendment rights de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010); State v. Lizarraga, 191 Wn. App. 530, 551, 364 P.3d 810 (2015). Since Ward argued that his Sixth Amendment right to present a defense has been violated, we review his claim de novo.[2]

The Sixth Amendment to the United States Constitution and article 1, sections 21 and 22 of the Washington Constitution guarantee a defendant the right to trial by jury

---

[2] This is in sharp contrast with the abuse of discretion standard for reviewing a trial court's refusal to give a jury instruction. If, for example, the trial court here had allowed Ward to introduce evidence supporting his necessity defense, but then refused, based on that evidence, to instruct the jury on necessity, we would review for abuse of discretion. State v. Read, 147 Wn.2d 238, 243, 53 P.3d 26 (2002).

and to defend against criminal allegations. State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038 35 L. Ed. 2d 297 (1973). "A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence." Jones, 168 Wn.2d at 720.

> The fundamental due process right to present a defense is the right to offer testimony and compel the attendance of a witness. '[I]n plain terms the right to present a defense [is] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.'

Lizarraga, 191 Wn. App. at 552 (quoting Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)).

This right is not absolute. "The defendant's right to present a defense is subject to established rules of procedure and evidence." Lizarraga, 191 Wn. App. at 533 (internal citation omitted). A defendant does not have a constitutional right to present irrelevant evidence. Jones, 168 Wn.2d at 720. "[I]f relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial." Darden, 145 Wn.2d at 622. "The State's interest in excluding prejudicial evidence must also be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld." Darden, 145 Wn.2d at 622.

Below, the trial court prohibited Ward from presenting evidence or witnesses on the necessity defense. If Ward submitted a sufficient quantum of evidence to show that he would likely be able to meet each element of the necessity defense, then the trial court's exclusion of evidence in support of his sole defense violated Ward's constitutional rights.

### III.

"[A]n act is justified if it by necessity is taken in a reasonable belief that the harm or evil to be prevented by the act is greater than the harm caused by violating the criminal statute." State v. Aver, 109 Wn.2d 303, 311, 745 P.2d 470 (1987). Necessity is available when "the pressure of circumstances cause the accused to take unlawful action to avoid a harm which social policy deems greater than the harm resulting from a violation of the law . . . [but not where] a legal alternative is available to the accused." State v. Gallegos, 73 Wn. App. 644, 651, 871 P.2d 621 (1994) (citing State v. Diana, 24 Wn. App. 908, 913-14, 604 P.2d 1312 (1979)).

To successfully raise the necessity defense the defendant must prove, by a preponderance of the evidence, that: (1) they reasonably believed the commission of the crime was necessary to avoid or minimize a harm, (2) the harm sought to be avoided was greater than the harm resulting from a violation of the law, (3) the threatened harm was not brought about by the defendant, and (4) no reasonable legal alternative existed. Gallegos, 73 Wn. App. at 650; See also 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 18.02, at 292 (4th ed. 2016) (WPIC).

The State argues that Ward's offer of proof failed to establish the elements of the necessity defense. A challenge to the sufficiency of evidence "admits the truth thereof and all inferences that can reasonably be drawn therefrom." State v. Cole, 74 Wn. App. 571, 578, 874 P.2d 878 (1994). "It requires the trial court and appellate courts to interpret the evidence most favorably for the defendant." Cole, 74 Wn. App. at 578-79. In this light, we review Ward's offer of proof as to each element of the necessity defense.

A.

Ward presented sufficient evidence that he reasonably believed the crimes he committed were necessary to minimize the harms that he perceived. Ward's offer of proof included evidence of how past acts of civil disobedience have been successful, evidence of previous climate activism campaigns, and evidence of his own personal successes in effectuating change through civil disobedience. Specifically, Ward offered evidence that he has been working with environmental issues for more than 40 years but that the majority of his efforts failed to achieve effective results. Ward asserted that because of these failures he "came to understand that the issue of climate change would require other than incremental change" and that "direct action was necessary to accomplish these goals." Ward offered three experts—Eric de Place, Bill McKibben, and Martin Gilens—who were prepared to testify as to the efficacy of civil disobedience and how such actions have become necessary in the climate movement. Ward argued that to decide whether his actions were "reasonably calculated to be effective in averting the imminent harm of climate change requires [the] expert testimony and evidence" that

he was prepared to present to the jury, and that whether his beliefs were reasonable was a question for the jury, not the trial court, to decide.

The State argues that it was unreasonable for Ward to believe that the commission of this crime was necessary to avoid or minimize harm. The State asserts, first, that all Ward did was temporarily inconvenience Kinder Morgan's employees so it was unreasonable to think that his actions would actually avoid or minimize the broader harms associated with climate change. And second, that because Ward had legal alternatives available it was unreasonable for him to believe that his actions were necessary to avoid or minimize harm.

Whether Ward's beliefs were reasonable was a question for the jury. See State v. Negrin, 37 Wn. App. 516, 524, 681 P.2d 516 (1984) ("It is the province of the jury to determine such issues" as whether the defendant acted with reasonable grounds.). And further, Ward did not have to prove that the harm he sought to avoid or minimize was actually avoided or minimized but instead that the reason he broke the law was in an attempt to avoid or minimize harm. Gallegos, 73 Wn. App. at 650 (describing the second prong as "the harm sought to be avoided [, not the harm actually avoided,] was greater than the harm resulting from a violation of the law."). Ward's past successes in effectuating change through civil disobedience in conjunction with the proposed expert witnesses and testimony about Ward's beliefs were sufficient evidence to persuade a fair minded, rational juror that Ward's beliefs were reasonable.

B.

Ward also offered sufficient evidence to show that the harms of global climate change were greater than the harm of breaking into Kinder Morgan's property. Ward

-7-

asserted that the extent of the harm resulting from his actions were the loss of a few locks and the temporary inconvenience to Kinder Morgan's employees. Compared to this, Ward introduced "voluminous scientific evidence of the harms of climate change." This evidence included information establishing climate change is real and detrimentally effecting Washington, and that tar sands oil poses a specifically acute threat to our environment. Further, Ward offered to present testimony from climate scientists, Drs. James Hansen, Richard Gammon, and Celia Bitz, supporting his defense.

C.

Whether the harms of global climate change was brought about by Ward was not an issue in this case. Nevertheless, Ward proffered evidence and expert testimony establishing the harms associated with global climate change and the root causes of global climate change.

D.

Ward also offered sufficient evidence to create a question of fact on whether there were reasonable legal alternatives. Ward argued that the window for action on climate change has narrowed to the point that immediate, emergency action is necessary. Ward offered evidence of his more than 40 years being involved in various environmental movements, the numerous attempts he has made to address climate change, and how most of those efforts have failed. Ward additionally offered proposed testimony by pipeline industry expert Eric de Place, professor and climate campaigner Bill McKibben, and professor of political science Martin Gilens, to the effect that the fossil fuel industry's influence over political institutions renders traditional legal avenues unreasonable as a means of addressing the climate emergency.

State v. Parker, 127 Wn. App. 352, 353, 111 P.3d 1152 (2005), discussed the "no reasonable alternative" element. Parker was charged with felon in possession of a gun. Parker claimed that he carried the gun because he had been shot the previous July and his assailants were still at large. Division Two of this court held that in order to show he had no reasonable alternative, Parker has to demonstrate "that he had actually tried the alternative or had no time to try it, or that a history of futile attempts revealed the illusionary benefits of the alternative.'" Parker, 127 Wn. App. at 355.

Here, in contrast with Parker, Ward offered evidence that he had tried the alternatives and they were unsuccessful. Whether Ward's evidence was sufficient to establish that his history of failed attempts to address climate change revealed the futility of supposed reasonable alternatives was a question for the jury. Viewed in the light most favorable to Ward, and admitting the truth of his evidence and all reasonable inferences therefrom, Ward's offer of proof created a question for the jury. Cole, 74 Wn. App. at 578-79.

Because Ward met his initial burden of showing that he would likely be able to submit a sufficient quantum of evidence on each element of necessity to make it a jury question whether he established that element beyond a reasonable doubt, the trial court violated his constitutional right by granting the State's motion in limine.

IV.

The State argues that the necessity defense is unavailable when the real purpose is to advertise a political debate. We agree with the State that if Ward's true intent was to induce jury nullification, then the trial court would not have erred in

-9-

prohibiting Ward's evidence. Therefore, in order to determine if the trial court erred we must also determine what Ward's purpose was in offering his evidence.

"Jury nullification occurs in a trial when a jury acquits a defendant, even though the members of the jury believe the defendant to be guilty of the charges." State v. Nichols, 185 Wn. App. 298, 301, 341 P.3d 1013 (2014). But the jury's power of nullification does not stem from any legal right. State v. Brown, 130 Wn. App. 767, 771, 124 P.3d 663 (2005). Rather, the power of nullification is rooted in courts' unwillingness to inquire into deliberations because jurors can agree to acquit on virtually any basis without court knowledge. See State v. Elmore, 155 Wn.2d 758, 771, 773-74, 123 P.3d 72 (2005). Nevertheless, Washington courts have concluded that a trial court does not err by instructing the jury that it has a duty to convict, rather than that it may convict, if it finds all of the elements of the crime charged beyond a reasonable doubt. See, e.g., State v. Meggyesy, 90 Wn. App. 693, 958 P.2d 319 (1998), abrogated on other grounds, State v. Recuenco, 154 Wn.2d 156, 110 P.3d 188 (2005).

A trial court does not abuse its discretion if it prohibits a party from introducing evidence solely intended to induce jury nullification. If here, for example, Ward's actions were purely symbolic—if they had no ability to actually avoid or minimize the harms he perceived—then his proffered evidence would have been aimed not at proving necessity but instead at inducing jury nullification. In such a situation, the trial court would not have erred in prohibiting such evidence. If, however, Ward's actions were not purely symbolic—if they had some ability to actually avoid or minimize his perceived harms—then the evidence he offered would not have been aimed at inducing jury nullification and the trial court would have erred in prohibiting it. When civil

disobedience and the necessity defense intersect, it is the intent of the protester, not the effectiveness of the protest, that is of the utmost relevance.

Here, in order to determine the intent behind Ward's actions, we must first determine what specific harm his protest was intended to avoid. If Ward was protesting global warming as a whole, then the impact of his action would be so infinitesimal that we would be unable to conclude anything other than that his actions were symbolic in nature. If, however, Ward was protesting more than climate change as a whole—if the harm he was attempting to alleviate was, for example, the danger of Canadian tar sands oil specifically or the danger that global warming poses to Washington—then we could conclude that his actions were actually intended to have an impact on the harm that he sought to avoid.

Below, Ward phrased the harm that he sought to avoid as more than just global climate change. Ward asserted that the harm he was attempting to avoid was threefold: (1) global climate change, generally, has the potential to destroy our way of life, (2) Canadian tar sands oil is a uniquely potent contributor to climate change, and (3) the localized impacts of climate change on Washington has the potential to be debilitating.

Ward argued that "tar sands oil represent[s] an elevated level of risk to global climate[,]" and that he felt he needed to act "in order to stop the advance of global warming, encompassing both current and projected warming in Washington state, ocean acidification, and impacts on local ecosystems and residents." Further, Ward argued that his "temporary shut-down of tar sands oil flowing through the Trans-Mountain Pipeline certainly minimized the harm flowing from that quantum's contribution

-11-

to climate change . . . and from the use of tar sands in particular." Ward also introduced exhibits about the danger that sea level rise poses to Washington.

Based on the specific harms that Ward asserted he was trying to avoid, his actions were not merely symbolic. The protesters' intent was to physically stop the flow of Canadian tar sands oil into the United States. Because one of the specific harm Ward asserted was that Canadian tar sands oil is a particularly potent contributor to climate change, the protest was not a purely symbolic act. It was a direct way of preventing a uniquely potent contributor to climate change from entering the United States.[3]

Because the harms that Ward asserted he was trying to alleviate were more than just climate change, generally, but also included both the specific dangers of Canadian tar sands oil and the impacts of sea level rise on Washington, Ward's actions were not intended to be merely symbolic in nature. As such, the evidence he planned to introduce was not solely aimed at inducing jury nullification and the trial court erred in preventing Ward from introducing evidence in support of his necessity defense.

V.

The violation of a defendant's constitutional right is presumed to be prejudicial, but may be harmless "if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error." Jones, 168 Wn.2d at 724. "Such a determination is made from an examination of the record from

---

[3] And this type of action appears to be somewhat of Ward's forte. In the past, Ward has physically placed himself in the way of what he perceived as serious threats to the environment, such as a coal transport ship, in an effort to stop those threats from causing harm.

which it must affirmatively appear the error is harmless." State v. Stephens, 93 Wn.2d 186, 191, 607 P.2d 304 (1980).

The closest question in this matter is whether Ward admitted that he had available reasonable legal alternatives. If he did, it would indicate that the trial court's error was harmless. The State points to Ward's testimony at trial concerning his legal alternatives.

> [Plaintiff's counsel]: What was your intent in shutting off that safety value on the 11th?
>
> [Ward]: To stop the flow of tar sands oil running through that pipeline.
>
> [Plaintiff's counsel]: Why were you attempting to do that?
>
> [Ward]: I was attempting to take the most effective measure that I could think of to address this problem to avoid cataclysmic climate change.
>
> [Plaintiff's counsel]: Did you believe that there was anything left to do that may have been legal that could have addressed the issue?
>
> . . . .
>
> [Ward]: I think that there are legal steps that can be taken, and I continue to take those. But I think that alone they are insufficient.
>
> [Plaintiff's counsel]: What are the other steps that you continue to participate in?
>
> [Ward]: Well, I'm engaged in efforts in my own state, which has been quite successful. The City of Portland has just announced a plan to shift to 100 percent renewable energy, and I supported that. I am engaged in general public education. And I am increasingly looking at ways to support candidates for office who endorse a significant plan of action on climate change.

When viewed in its entirety, Ward's testimony indicates that Ward was addressing the ineffectiveness of his alternatives and was not admitting that he had reasonable legal alternatives available to him. Moreover, if the jury was allowed to hear Ward's testimony in conjunction with the excluded expert testimony, it could well have concluded that Ward's available legal alternatives were futile. The error was not harmless.

-13-

We reverse and remand.

Mann, ACJ

WE CONCUR:

Smith, J.

Dwyer, J.