IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, ) | No. 78089-1-I |
| Respondent, ) | |
| ) | DIVISION ONE |
| v. ) | |
| ) | |
| NICHOLAS CONAN ORN, ) | UNPUBLISHED OPINION |
| ) | |
| Appellant. ) | |
| ) | FILED: November 18, 2019 |

SMITH, J. — Nicholas C. Orn appeals his conviction for attempted first degree murder. He argues that the jury was improperly instructed and that the trial court erred by excluding evidence that the victim was involved in a later incident that led to his becoming a confidential informant. In a statement of additional grounds for review, Orn also argues that he was deprived of his right to confront witnesses because the State decided not to call Ian Warmington, one of the detectives who processed the crime scene.

We hold that the jury was properly instructed because the jury instructions, taken as a whole, properly informed the jury of the applicable law, were not misleading, and allowed Orn to argue his theory of the case. We also hold that because the evidence regarding the victim's criminal activities was properly excluded under established evidence rules, its exclusion did not deprive Orn of his right to present a defense or his right to confront witnesses. Finally, we conclude that the State's decision not to call Detective Warmington did not

## FACTS

This case arises from a shooting that occurred at the Rock Creek Landing apartment complex in Kent. In May or June of 2016, the victim, Thomas Darling-Seamans, moved in with his mother, Debra Darling, in her apartment unit at the complex. When things became too crowded after a friend of Darling-Seamans' also began staying at Darling's apartment, Darling rented a garage unit at the complex so that "the kids could put their things in the unit." Ultimately, Darling-Seamans and his friend began living in the garage unit. Darling-Seamans converted it into a living space, with sheets dividing the "living room" area at the front of the garage from the beds in the back.

Darling-Seamans, a self-described "proactive pothead[,]"was smoking marijuana in the garage one day with the door open when Kimberly Boals, who lived in the complex with Orn, her boyfriend, walked by and offered to pay Darling-Seamans "a couple dollars for a hit." Darling-Seamans "was like don't even worry about it, come on in, join." After that, Boals visited Darling-Seamans often and "would just cry about her problems and . . . her relationship" with Orn. Although Darling-Seamans and Orn had smoked together "[l]ike once[,]" Darling-Seamans did not know Orn very well: "[W]e were cordial but not friends."

On July 17, 2016, Boals and Orn broke up. Boals later testified that Orn moved out the next day, July 18, 2016. Orn took some of his belongings, left behind other items that were either his or that he and Boals shared, and moved in with his father.

Boals, who was not working at the time, became worried about having

2

enough money to pay rent. According to her later testimony, Boals, assisted by Darling-Seamans, identified some items in Boals's apartment that she could sell for rent money, and placed them in a blue tote. Boals testified that this happened on July 18, 2016, i.e., the same day that Orn moved out. According to Darling-Seamans, he purchased the items in the tote from Boals for 60 or 70 dollars. Additionally, Boals agreed to give a portable air conditioning (AC) unit to Darling-Seamans in exchange for 40 dollars' worth of marijuana.

Boals and Darling-Seamans went back to Darling-Seamans' garage with the blue tote and the AC unit and "were just chilling" when, a short time later, Orn and his father came to the complex to pick up the rest of Orn's belongings. They discovered Boals and Darling-Seamans in the garage unit, "a bunch of us smoking weed and, you know, the AC unit was there and then the tote." Boals later testified that Orn "was upset because it was obviously without his permission." Darling-Seamans later described Orn as "[p]issed as fuck" and "[s]haking, yelling he wanted his stuff back." Darling-Seamans gave the blue tote to Orn. He also worked out an agreement to keep the AC unit in exchange for paying Orn additional money for it in the future.

About two weeks later, the morning of August 2, 2016, Orn went to Boals's apartment. According to Boals's later testimony, the two went to the bank, had a meal, and "kind of just had said our good-byes, kind of more mutual, . . . you know, maybe we can be friends." Boals recalled that when the two parted ways that early afternoon, "we were pretty calm. It was kind of like the good-bye, you know, you kind of would want in a relationship, kind of see you around and stay

3

in contact kind of thing."

Later that evening, around 8:30 or 9:00 p.m., Boals was walking back from the garbage dumpster after throwing some things away when she saw Orn pull up and get out of his car with a rifle. Boals later testified that Orn was "angry, irrational, not in a good state of mind" and that he was acting "totally . . . opposite, like a flip" from the way he had been acting when she saw him earlier that day. Boals testified that Orn was upset and that "he was going to go confront [Darling-Seamans]." Although she could not recall exactly what Orn said, she testified that Orn "had the gun and he was going to at least threaten and/or shoot [Darling-Seamans]." The two ultimately made their way to Boals's apartment. Boals later testified that while they were standing in the kitchen, Orn, who had brought his rifle with him, "put the clip on the gun." Boals testified that she was frightened and threatened to get law enforcement involved. Boals recalled that Orn "didn't seem concerned" or said something to the effect of, "I don't want to hurt you as well, . . . don't do that." Boals recalled threatening again to "call the cops or get help of some kind . . . to stop this from happening[,]" and then Orn walked out the door with his gun. Boals went to the bathroom "because at that point, I mean, I had—there was nothing I could do."

As Boals was finishing up in the bathroom, Orn walked into the doorway and, according to Boals, "had the rifle under his chin and was threatening himself." Boals later testified that she said "don't do that," but that Orn said, "I'm going to do it because I just shot [Darling-Seamans] like 20 times." Boals recalled that she was shocked, ran past Orn out of the apartment, discovered

4

Darling-Seamans shot and bleeding, and ran to try to get help.

Darling-Seamans, who at the time was working a night shift, later testified that he had been lying the couch in his garage before going to work when, all of a sudden, the door "just kind of yanked open, and . . . I jerked up and saw [Orn] standing there pointing a gun at me as he asked real quick where's my stuff at." Darling-Seamans testified that he stood up, said "dude," and "that was pretty much it." "It was like right when I stood up, it was over. I got hit right here first time, shot me to the side and just littered my whole left side with bullets." Darling-Seamans testified that when the shooting began, he went into "flight" mode and turned around and ran toward the back of his garage while Orn was "still standing there just ping, ping, ping like I'm a little duck, and he was just like on me, on me, on me, on me." Darling-Seamans testified that he tried to take cover underneath a dirt bike in the back of his garage. "I just kind of tucked underneath and I was right by my bed, and I couldn't tell if he came in or not. I was still getting layered with bullets." When the shooting stopped, Darling-Seamans got to his feet, stumbled toward the apartment complex, and banged on a door for help. At least two neighbors called 911, Kent police responded to the scene, and Darling-Seamans was taken to Harborview. Although Darling-Seamans suffered numerous bullet wounds, he survived.

The State charged Orn with one count of assault in the first degree and one count of attempted murder in the first degree. Before trial, the State moved in limine to exclude evidence that Darling-Seamans "was being employed by the Kent Police Department as a confidential informant based upon a completely

unrelated situation." Specifically, the State moved "to exclude defense from introducing any evidence of this arrangement, as well as the underlying alleged criminal activity the victim may be involved in, which led to his agreement with Kent Police." Meanwhile, Orn moved in limine to admit that evidence, arguing that "[s]uch instances of potentially avoidable prosecution by the same police department at issue herein, reflect bias, lack of truthfulness, and bad acts-motive, intent, absence of mistake, and concerns the same subject matter at issue herein, to wit., stolen property, firearms." The trial court ruled that it would allow only "very limited inquiry on this." It explained that although it would not allow any questioning "regarding the agreement itself or the nature of the agreement or the case[,]" it *would* allow defense counsel to ask Darling-Seamans something to the effect of, "'and isn't it true that since the incident you've . . . done some work with the Kent Police Department?'" It reasoned that this limited inquiry was relevant to Darling-Seamans' potential bias.

Later, after Darling-Seamans testified that he "just stay[s] proactive in not doing anything out of the question really[,]"Orn asked the trial court to reconsider its ruling. Specifically, Orn's counsel requested the court's permission to ask Darling-Seamans, "Is it true you've been arrested by the police and you have a deal, agreement with the police to help them on narcotics, stolen property, firearms in return for nonforwarding of the allegation to the prosecutor, correct?" Orn argued that Darling-Seamans had "open[ed] the door" to this line of questioning when he testified to the effect that he was not doing anything "out of the question." The trial court disagreed and stood by its earlier ruling, explaining

that "I don't think that that opens the door to impeach him on every wrong thing he might have done in his life."

A jury found Orn guilty of both assault in the first degree and attempted murder in the first degree, in each case while armed with a firearm. The court vacated the assault conviction and adjudged Orn guilty of attempted murder in the first degree with a firearm enhancement. Orn appeals.

ANALYSIS

*Jury Instructions.*

Orn argues that reversal is required because the court's to-convict instruction failed to instruct the jury on each element of attempted first degree murder. We disagree.

"The due process clause of the Fourteenth Amendment to the United States Constitution requires that jury instructions adequately convey to the jury that the State bears the burden of proving 'every element of the crime charged beyond a reasonable doubt.'" State v. Imokawa, No. 96217-1, slip op. at 6 (Wash. Oct. 10, 2019), http://www.courts.wa.gov/opinions/pdf/962171.pdf (quoting State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002)). "When a defendant challenges the adequacy of specific jury instructions informing the jury of the State's burden of proof, we review the challenged instructions de novo in the context of the instructions as a whole." Imokawa, slip op. at 6-7. "'Instructions satisfy the requirement of a fair trial when, taken as a whole, they properly inform the jury of the applicable law, are not misleading, and permit the defendant to argue his [or her] theory of the case.'" Imokawa, slip op. at 7

(alteration in original) (quoting State v. Tili, 139 Wn.2d 107, 126, 985 P.2d 365 (1999)).

"Generally, it is sufficient to explicitly instruct the jury that the State must prove beyond a reasonable doubt the statutory elements of the crime." Imokawa, slip op. at 7. To that end, RCW 9A.28.020(1) defines the elements of criminal attempt and provides, "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." In other words, "an attempt crime contains only two elements—[1] intent to commit a specific crime and [2] taking a substantial step toward the commission of that crime." State v. Nelson, 191 Wn.2d 61, 74, 419 P.3d 410 (2018).

Here, the court's to convict instruction, which is consistent with WPIC 100.02, instructed the jury as follows:

> To convict the defendant of the crime of attempted murder in the first degree, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about August 2, 2016, the defendant did an act that was a substantial step toward the commission of murder in the first degree;
> (2) That the act was done with the intent to commit murder in the first degree; and
> (3) That the act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to Count I.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to Count I.[1]

---

[1] WPIC 100.02 provides:

The court provided another instruction, Instruction No. 10, which defined murder in the first degree: "A person commits the crime of murder in the first degree when, with premeditated intent to cause the death of another person, he or she causes the death of such person . . . ."[2]

The court's instructions were adequate. Specifically, the to-convict instruction set forth both statutory elements of attempt; no elements were missing from the instruction. Additionally, when taken together, the instructions informed the jury of the applicable law, were not misleading, and permitted Orn to argue his theory of the case. To this end, Orn indicated in his trial memorandum that he "anticipates that the evidence presented in trial will include that the Defendant was not acting with premeditated intent or with a design to kill." And his counsel argued at length in closing that the evidence was insufficient to prove that Orn

---

To convict the defendant of the crime of attempted (fill in crime), each of the following elements of the crime must be proved beyond a reasonable doubt:
    (1) That on or about (date), the defendant did an act that was a substantial step toward the commission of (fill in crime);
    (2) That the act was done with the intent to commit (fill in crime); and
    (3) That the act occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

    11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 100.02, at 434 (4th ed. 2016).
    [2] The language omitted from the end of Instruction No. 10 was related to Orn's self-defense claim and is not relevant here.

had the requisite mental state.  Therefore, reversal is not required.

Orn disagrees.  He contends that premeditation is an essential element of attempted first degree murder.  Thus, he argues, the trial court committed reversible error when it omitted premeditation from the to-convict instruction.  Orn chiefly relies on State v. Vangerpen, 125 Wn.2d 782, 888 P.2d 1177 (1995), to support his argument, but his reliance on Vangerpen is misplaced for two reasons.

First, Vangerpen did not hold that premeditation is an essential element of attempted first degree murder.  Instead, as Orn himself acknowledges, the State conceded in Vangerpen that premeditation was an essential element; therefore, that issue simply was not before the court.  See Vangerpen, 125 Wn.2d at 785-86; see also State v. Boswell, 185 Wn. App. 321, 336, 340 P.3d 971 (2014) ("Vangerpen does not articulate what the essential elements of attempted first degree murder are.").

Second, Vangerpen involved a challenge to a charging document, not a challenge to a jury instruction.  Vangerpen, 125 Wn.2d at 787.  "The rule that a charging document must include all essential elements of a crime is grounded in the constitutional requirement that defendants be informed of the nature and cause of the accusation against them, in addition to due process concerns regarding notice." State v. Taylor, 140 Wn.2d 229, 236, 996 P.2d 571 (2000).  Meanwhile, "'a to convict instruction must contain all of the elements of the crime because it serves as a yardstick by which the jury measures the evidence to determine guilt or innocence.'" State v. DeRyke, 149 Wn.2d 906, 910, 73 P.3d

1000 (2003) (internal quotation marks omitted) (quoting State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)). In other words, the to-convict instruction ensures "that the jury is not left guessing at the meaning of an element of the crime and that the State is not relieved of its burden of proving each element of the crime." State v. Saunders, 177 Wn. App. 259, 261, 311 P.3d 601 (2013). Therefore, "the fact that a portion of a definition must be included in a[ ] . . . [charging document] does not mean it is essential to a to-convict instruction." Saunders, 177 Wn. App. at 270. Thus, Vangerpen does not control.

Rather, DeRyke is instructive here. In that case, our Supreme Court reiterated that the crime of attempt has only two elements. DeRyke, 149 Wn.2d at 910. It also expressly approved of instructing the jury on attempt using WPIC 100.02 and using a *separate* instruction to set forth the elements of the crime allegedly attempted. DeRyke, 149 Wn.2d at 911. Indeed, the Supreme Court itself later characterized DeRyke as "reiterat[ing] . . . that an attempt instruction *does not have to provide the elements of the crime allegedly attempted.*" Nelson, 191 Wn.2d at 74 (emphasis added). Here, by instructing the jury on attempt through WPIC 100.02 and using a separate instruction to set forth the elements of first degree murder, the trial court followed the same approach expressly approved of in DeRyke. This was not error. Indeed, we have relied on DeRyke to reject exactly the argument that Orn makes here. See, e.g., State v. Jefferson, 199 Wn. App. 772, 809-10, 401 P.3d 805 (2017), rev'd on other grounds, 192 Wn.2d 225, 429 P.3d 467 (2018); Boswell, 185 Wn. App. at 336-37; cf. State v. Reed, 150 Wn. App. 761, 772, 208 P.3d 1274 (2009) (rejecting the same

argument and stating that it "conflates the intent necessary to prove an attempt with that necessary to prove first degree murder.").

As a final matter, Orn reasons that "by requiring the jury find only that Mr. Orn intended to commit first degree murder, the instruction told the jury it was enough that he intended to premeditate the intent to cause death." He contends that as a result, the instruction is similar to the defective instruction in State v. Smith, 131 Wn.2d 258, 930 P.2d 917 (1997). In Smith, which involved a conspiracy charge, the to-convict instruction should have required the jury to find that the defendant agreed with his alleged co-conspirators *to engage in conduct constituting the crime of first degree murder.* Smith, 131 Wn.2d at 262. Instead, the instruction required the jury to find that the defendant agreed with his alleged co-conspirators "'to engage in . . . the performance of *conduct constituting the crime of Conspiracy to Commit Murder in the First Degree.*'" Smith, 131 Wn.2d at 261 (first alteration added; emphasis added). Our Supreme Court held that this instruction was "constitutionally defective because it purports to be a complete statement of the law *yet states the wrong crime as the underlying crime which the conspirators agreed to carry out.*" Smith, 131 Wn.2d at 263 (emphasis added).

The to-convict instruction here did not suffer from the same defect. Rather, it stated the correct crime, i.e., first degree murder, as the underlying crime that Orn allegedly attempted to carry out. Moreover, the instruction in Smith was, as a result of the defect, entirely circular: It instructed the jury to find the defendant guilty of conspiracy if he engaged in conduct constituting

12

conspiracy. Thus, as the <u>Smith</u> court explained, the instruction "fails to state the law completely and correctly." <u>Smith</u>, 131 Wn.2d at 263. Here, by contrast, the to-convict instruction completely and correctly stated the law. Specifically, it required the jury to find that Orn "did an act that was a substantial step toward the commission of murder in the first degree" and that "the act was done *with the intent to commit murder in the first degree.*" When taken together with the definition of murder in the first degree, the instruction required the jury to find that the act was done with the intent to "with a premeditated intent to cause the death of another person, . . . cause[ ] the death of such person." In other words, the jury could not have convicted Orn of attempted *first degree murder* without finding that he intended to cause the death of another person *with premeditated intent to cause the death of another person.* The instruction did not relieve the State of its burden.

### *Exclusion of Evidence of Darling-Seamans' Criminal Activities*

Orn argues that by excluding evidence of Darling-Seamans' criminal activities underlying his confidential informant arrangement with law enforcement, the trial court deprived him of his Sixth Amendment rights to confront witnesses and to present a defense. We disagree.

We review de novo a claim of denial of Sixth Amendment rights. <u>State v. Jones</u>, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). The Sixth Amendment to the United States Constitution guarantees the defendant a right to defend against criminal allegations. <u>State v. Ward</u>, 8 Wn. App. 2d 365, 370, 438 P.3d 588 (2019). It also guarantees the defendant the right to confront and cross-examine

adverse witnesses. State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002).

But these rights are not absolute, and "'[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" State v. Lizarraga, 191 Wn. App. 530, 553, 364 P.3d 810 (2015) (second alteration in original) (quoting Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)); see also Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (observing that the Constitution permits judges to exclude evidence under well-established rules of evidence). To that end, we review rulings on the admissibility of evidence for abuse of discretion, and we may affirm such rulings on any basis supported by the record. State v. Kennealy, 151 Wn. App. 861, 879, 214 P.3d 200 (2009).

Here, Orn does not analyze whether the trial court abused its discretion under the evidence rules when it excluded evidence of Darling-Seamans' criminal activities. But it did not. Specifically, ER 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." That said, the trial court has discretion to admit otherwise inadmissible evidence on cross-examination "if the witness 'opens the door' during direct examination and the evidence is relevant to some issue at trial." State v. Stockton, 91 Wn. App. 35, 40, 955 P.2d 805 (1998). "For example, when a witness testifies to his good character on direct examination, the opposing party is entitled to make further inquiries on the subject during cross-examination even though that evidence

would otherwise be inadmissible." Stockton, 91 Wn. App. at 40. "But a passing reference to a prohibited topic during direct does not open the door for cross-examination about prior misconduct." Stockton, 91 Wn. App. at 40.

Darling-Seamans' statement that he is a "proactive pothead" who "just stay[s] proactive in not doing anything out of the question really" was at most a passing reference to his character. It does not, as Orn would have us believe, constitute an affirmative statement that he is "law-abiding." Indeed, Darling-Seamans volunteered during his direct testimony that on the night of the shooting he had taken "Ecstasy," a drug he acknowledged was illegal. Thus, the trial court did not abuse its discretion by ruling that Darling-Seamans' testimony did not open the door to the otherwise inadmissible evidence of his criminal activities. There was no evidentiary error here. And because Orn does not argue that the trial court applied an evidentiary rule that was arbitrary or disproportionate to the ends it was designed to serve, there also was no constitutional error. Cf. Holmes, 547 U.S. at 326 ("[T]he Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote.").

Instead of analyzing the trial court's ruling under the evidence rules, Orn argues that "the evidence was admissible unless the State could establish its admission would prejudice the fact-finding process." He relies on State v. Jones to support his argument. But Jones involved the trial court's exclusion of "evidence of extremely high probative value" constituting the defendant's "entire defense." Jones, 168 Wn.2d at 721. Here, Orn sought to introduce evidence of

15

Darling-Seamans' criminal activities to call his credibility into question; the evidence was not Orn's entire defense. Therefore, <u>Jones</u> is readily distinguishable and does not control.

### *Statement of Additional Grounds*

In a statement of additional grounds for review, Orn alleges that the State "[b]urned" Detective Warmington as a witness by deciding not to call him to testify and then allowing him to be present in the courtroom during another detective's testimony. He alleges further that "[d]efense was made aware of this only after-the-fact" and that "[t]his prevented us from cross-examination of the witness because the prosecut[o]r didn't call on him for examination, and kept [d]efense from calling him . . . due to his being present to [another detective]'s related testimony." Orn argues that, as a result, his right to confront witnesses was violated because he was unable to "confront Detective Warmington's [e]vidence collection, and his [g]raphs presented to the jury."

But the State is not required to call every witness on its list. And the point at which Orn's counsel became aware of the State's decision, as well as whether Detective Warmington was present for another witness's testimony, are matters outside the record that we do not consider in this direct appeal. <u>State v. McFarland</u>, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Furthermore, Orn had the opportunity to cross-examine Detective Moore, who handled the evidence collection with Detective Warmington and created the crime scene diagram with Detective Warmington. Therefore, Orn's argument fails.

No. 78089-1-I/17

We affirm.

WE CONCUR: