IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, Ex Rel. | ) | No. 36506-9-III |
| LAWRENCE H. HASKELL, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPOKANE COUNTY DISTRICT | ) | PUBLISHED OPINION |
| COURT, JUDGE DEBRA R. HAYES, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| GEORGE E. TAYLOR, | ) | |
| | ) | |
| Petitioner. | ) | |

LAWRENCE-BERREY, J. — George Taylor protested the delivery of oil and coal by

railcars while standing on BNSF Railway Company's mainline tracks. He refused to

leave the tracks when directed by law enforcement, and the State charged him with

second degree trespass and obstructing a train. We granted Taylor's petition for

discretionary review to determine whether he can assert the defense of necessity.

Persuasive authority rejects the notion that a person engaged in civil disobedience

may assert a necessity defense when charged with violating constitutional laws. We

conclude that Taylor had reasonable legal alternatives other than trespassing on BNSF's

tracks and obstructing a train, even if those alternatives had not brought about timely

legislative changes.

FACTS[1]

Reverend George Taylor was part of a group of protestors who walked onto BNSF

property and stood on the mainline tracks. "No Trespassing" signs were posted, and

Taylor knew the property was private and he had no permission to enter the property.

Clerk's Papers (CP) at 167. Taylor and his fellow protestors held signs and banners

protesting the transport of coal and oil. For the safety of the protestors, trains in the

general vicinity were held idling at the railway yard.

BNSF and other law enforcement officers responded. The protestors, including

Taylor, were told they would be arrested if they refused to leave. Three protestors,

including Taylor, politely refused to leave and remained on the tracks. Law enforcement

escorted the three off the tracks and peacefully arrested them.

The State charged Taylor with criminal trespass in the second degree and unlawful

obstruction of a train, both misdemeanors. Taylor filed a motion requesting to assert the

---

[1] We take our facts from the district court's unchallenged findings.

2

defense of necessity.  At the hearing, Taylor and two of his experts testified in support of his motion, and Taylor submitted a declaration of his third expert.

First, Taylor called Dr. Steven Running, a regents professor of ecology at the University of Montana.  Dr. Running was the lead author for the 4th Assessment of the Intergovernmental Panel on Climate Change.  He shared the Nobel Peace Prize with Al Gore in 2007.  Dr. Running noted three facts that climate scientists observe: (1) greenhouse gases and carbon dioxide have been increasing in the atmosphere over the last 50 years, (2) because of the increase in greenhouse gases, the global temperature has risen and, in the last 20 years, the temperature rise has accelerated, and, (3) a reduction in carbon emissions is necessary to stabilize the global climate.

Human behavior has caused the rise of carbon emissions—the largest single source of carbon dioxide ($CO_2$) emissions is from burning coal, the second leading cause is from burning oil, and the third largest contributor is from burning natural gas.  Dr. Running recommended that in order to reduce carbon emissions, people around the globe need to stop burning coal, stop burning oil, and move to nonfossil fuel energy sources.  China is the biggest consumer of coal.  China purchases a lot of coal from Montana and Wyoming, which is then shipped by train through western cities, including Spokane.

Next, Taylor called Tom Hastings, an assistant professor of conflict resolution at Portland State University. Professor Hastings has served on the Peace and Conflict Studies Consortium, the Peace and Justice Studies Association of the Binational U.S.-Canada Academic Association, the International Peace Research Association Foundation, and the International Center on Nonviolent Conflict in Washington D.C. Professor Hastings specializes in civil resistance, civil disobedience, and strategic nonviolent conflict.

Professor Hastings testified that civil resistance is effective in bringing about social change. A comprehensive study showed that nonviolent civil resistance is twice as effective as violent civil resistance and is more likely to succeed in achieving the desired goal. Often times, the classic nonviolent resistance campaign attempts to reach the media to try to help educate citizens because that is how public policy is transformed. In his opinion, Taylor's actions aligned with a nonviolent civil resister. In civil disobedience cases, the judicial branch is the last best hope. Professor Hastings testified that civil resistance can reduce climate change.

Taylor intended to call Fred Millar, but because Mr. Millar could not make the hearing, Taylor submitted Mr. Millar's declaration. Mr. Millar is an international analyst in nuclear waste storage and transportation, accident prevention, and emergency planning

4

and homeland security. Mr. Millar's declaration addressed the preparedness and emergency protocols to protect public safety in the event of crude oil train derailments, spills, or explosions. In his opinion, the nation is inadequately prepared for such circumstances and the harm associated with crude oil train derailments, spills, or explosions are imminent. The United States has almost monthly occurrences of some type of crude oil train derailment, spill, or explosion. Some have involved trains carrying coal from Montana and some have involved trains traveling through Spokane.

Lastly, Taylor testified. He said he protested on the train tracks to bring local legislative attention to the imminent danger posed by coal and oil trains that pass through cities. Taylor is involved in environmental education and studies, participates in the Safer Spokane Initiative, is a member of the Sierra Club, and votes for "green" candidates— those who want to save and preserve the environment. CP at 143. In addition, he has brought his concerns to many local state and federal officials. He testified that nothing in the environmental community was working, and he was quite discouraged. He believed there was no other reasonable alternative than to protest on the railroad tracks.

Taylor believed his actions were necessary to avoid the imminent danger to Spokane citizens of train derailment and to minimize the danger to the Earth due to

climate change. He believed the danger to the public through the railroad transport of coal and oil through Spokane was far greater than his act of trespassing.

The district court entered findings of fact and conclusions of law and discussed the four elements a defendant must establish to assert the defense of necessity. With respect to the fourth element, the element contested on appeal, the district court concluded Taylor was required to establish "the *Defendant* believed no reasonable legal alternative existed." CP at 15 (emphasis added). Because Taylor believed no reasonable legal alternative existed to trespassing and obstructing a train, and because he had presented sufficient evidence of the first three elements, the district court granted Taylor's motion allowing him to present the defense of necessity at trial.

Soon after the ruling, the State filed an application for statutory writ of review with the county superior court. The superior court granted the writ without notice to Taylor. The writ ordered four things: (1) that it be served on the district court within 20 days, (2) that the district court record be transmitted to superior court in accordance with applicable rules, (3) that the parties agree to a briefing schedule, and (4) that the district court proceedings be stayed pending superior court review.

The State thereafter served Taylor with its application and writ. Taylor moved to disqualify the superior court judge pursuant to RCW 4.12.050. The superior court denied

6

Taylor's motion, reasoning that the issuance of the writ was a discretionary ruling that caused Taylor's motion to be untimely.

In their briefs to the superior court, the parties discussed the four elements of the defense of necessity, including the fourth element, whether "no reasonable legal alternative existed" other than for Taylor to trespass and obstruct trains. In its decision, the superior court wrote: "[Taylor] . . . has interpreted 'reasonable' to be synonymous with effective; that is, not whether legal alternatives exist to protest climate change, but whether the attempts to utilize those alternatives to date have been effective." CP at 232. The trial court disagreed with Taylor's interpretation and concluded the standard was whether no reasonable legal alternative existed. The superior court determined that Taylor had reasonable legal alternatives and reversed the district court.

Taylor timely petitioned this court for discretionary review and raised two issues. First, whether the superior court erred by precluding him from raising the defense of necessity. Second, whether the superior court erred by not disqualifying itself.

Our commissioner denied Taylor's petition. Taylor moved to modify our commissioner's decision, and we granted Taylor's motion. A panel of this court considered these issues without oral argument.

No. 36506-9-III
*State v. Spokane County Dist. Court*

ANALYSIS

A.    NOTICE OF DISQUALIFICATION

As a preliminary matter, we address Taylor's argument that the superior court erred by not disqualifying itself.

Due process and the appearance of fairness doctrine require disqualification of a judge who is biased against a party or whose impartiality may be reasonably questioned. *State v. Ryna Ra*, 144 Wn. App. 688, 704-05, 175 P.3d 609 (2008).  Taylor did not seek to disqualify the superior court judge under these standards.  To the extent his arguments on appeal raise due process and appearance of fairness concerns, we deem those arguments waived.  RAP 2.5(a); *In re Rapid Settlements, Ltd.*, 166 Wn. App. 683, 695, 271 P.3d 925 (2012).

Taylor sought to disqualify the superior court judge pursuant to a statute.  RCW 4.12.050, in its current form,[2] provides in relevant part:

> (1)  Any party to or any attorney appearing in any action or proceeding in a superior court may disqualify a judge from hearing the matter, *subject to these limitations*:
>        (a)       Notice of disqualification must be filed and called to the attention of the judge before the judge has made any discretionary ruling in the case.

---

[2] The current version of this statute applies.  It became effective on July 23, 2017, and Taylor filed his notice of disqualification after that date—on April 4, 2018.

No. 36506-9-III
*State v. Spokane County Dist. Court*

(Emphasis added.)

We first discuss whether the superior court's issuance of a writ of review is a discretionary ruling. A writ of review may be granted in limited circumstances specified by statute. RCW 7.16.040. A court may deny the writ or it may require notice before granting a writ, or it may grant the writ without notice. *See* RCW 7.16.050. Here, the superior court chose to grant the writ without notice to Taylor. Taylor does not dispute that granting the writ was a discretionary act.

We next discuss how to construe RCW 4.12.050(1)(a) in the context of a defendant having had no opportunity to file a notice of disqualification prior to the court's discretionary ruling. "Statutes are to be interpreted as they are plainly written, 'unless a literal reading would contravene legislative intent by leading to a strained or absurd result.'" *Pub. Util. Dist. No. 1 of Klickitat County v. Walbrook Ins. Co.*, 115 Wn.2d 339, 343, 797 P.2d 504 (1990) (quoting *Marine Power & Equip. Co. v. Dep't of Transp.*, 102 Wn.2d 457, 461, 687 P.2d 202 (1984)) Here, subsection (1) of the statute is "subject to the limitation[ ]" of subsection (a). It is undisputed that Taylor did not file his notice of disqualification before the trial court made its discretionary ruling. Therefore, a literal reading of RCW 4.12.050(1)(a) results in entities, not yet a party, having no right to

9

file a notice of disqualification if the trial court had previously exercised its discretion in the case.

This literal reading is inconsistent with established precedent. But the prior statute contained limiting language not present in the current statute. Former RCW 4.12.050(1) (2009) provides in relevant part:

> Any party to or any attorney appearing in any action or proceeding in a superior court, may [disqualify a judge by motion and affidavit of prejudice]: PROVIDED, That such motion and affidavit is filed and called to the attention of the judge before he or she shall have made *any ruling whatsoever in the case . . . of which the party making the affidavit has been given notice*, and before the judge presiding has made any order or ruling involving discretion . . . .

(Emphasis added to emphasize limitation.) There is no similar limitation in RCW 4.12.050(1)(a). Arguably, under the current statute, the party requesting a new judge need not have been given notice of the matter over which the trial court previously exercised discretion. The parties do not discuss this change in the statute and how it impacts prior decisions.[3]

---

[3] The dissent argues that former RCW 4.12.050 and current RCW 4.12.050(1)(a) should be read similarly, despite the noted difference in language. The dissent suggests this must be done to preserve a litigant's fundamental right to an impartial decision-maker. We disagree.

Due process and the appearance of fairness doctrine require judicial disqualification if the judge is biased or if the judge's impartiality may be reasonably questioned. *Ryna Ra*, 144 Wn. App. at 704-05. These rights are independent of

10

Nevertheless, it is not necessary for us to resolve this preliminary issue. Even if we resolved it in Taylor's favor, we would decide the substantive issue now rather than remand the substantive issue for the superior court to decide. In the interest of judicial economy, an appellate court may consider an issue that is likely to occur following remand if the parties have briefed and argued the issue in detail. *Philadelphia II v. Gregoire*, 128 Wn.2d 707, 716, 911 P.2d 389 (1996). The issue of whether Taylor is permitted to assert a necessity defense is a purely legal issue that has been fully briefed and argued by the parties. Were we to remand without resolving this substantive issue, the parties would find themselves back before us in due time and after much expense. Judicial economy compels us to decide the substantive issue now.

B.     NECESSITY DEFENSE

Taylor contends the superior court erred when it reversed the district court and held he could not assert the defense of necessity. We review de novo whether a defendant proffered sufficient evidence to merit presentation of a defense to a jury. *State v. Fry*, 168 Wn.2d 1, 11, 228 P.3d 1 (2010).

---

RCW 4.12.050. Taylor did not assert below that due process or the appearance of fairness doctrine required the trial judge to disqualify himself. Rather, Taylor relied on RCW 4.12.050.

11

The Sixth Amendment to the United States Constitution and article I, sections 21 and 22 of the Washington Constitution guarantee a criminal defendant the right to defend against criminal allegations. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). "A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and offer testimony, is basic in our system of jurisprudence." *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

This right is not absolute. A defendant does not have a constitutional right to present irrelevant evidence. *Id.* Therefore, if Taylor cannot demonstrate a colorable necessity defense, he may not present evidence relevant to that defense.

"[A]n act is justified if it by necessity is taken in a reasonable belief that the harm or evil to be prevented by the act is greater than the harm caused by violating the criminal statute." *State v. Aver*, 109 Wn.2d 303, 311, 745 P.2d 479 (1987). To raise the defense of necessity, a defendant must show by a preponderance of the evidence: "(1) [the defendant] reasonably believed the commission of the crime was necessary to avoid or minimize harm, (2) the harm sought to be avoided was greater than the harm resulting from a violation of the law, (3) the threatened harm was not brought about by the

12

defendant, and (4) no reasonable legal alternative existed."[4] *State v. Ward*, 8 Wn. App. 2d 365, 372, 438 P.3d 588 (citing *State v. Gallegos*, 73 Wn. App. 644, 650, 871 P.2d 621 (1994); 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTION: CRIMINAL 18.02, at 292 (4th ed. 2016)), *review denied*, 193 Wn.2d 1031, 447 P.3d 161 (2019). The parties largely focus on the fourth element, which we believe is dispositive.

Taylor relies on *Ward*. There, Ward broke into a pipeline facility and closed a valve to stop the flow of tar sands oil. The State charged Ward with burglary in the second degree. *Id.* at 368-69. He asserted a necessity defense and argued he broke into the facility and closed the valve to protest the use of tar sands oil, which he believed significantly contributed to climate change. He argued his act was necessary because the government had failed to take meaningful action to address climate change. *Id.* at 369. Before trial, the court granted the State's motion in limine to prevent Ward from presenting evidence of necessity. *Id.* A jury found the defendant guilty. He appealed and argued the trial court erred by disallowing his necessity defense. Division One of this court agreed.

---

[4] Our Supreme Court has explicitly adopted the "reasonable legal alternative" standard. *State v. Vander Houwen*, 163 Wn.2d 25, 31-32, 177 P.3d 93 (2008). Although the dissent suggests different standards, *Vander Houwen* is controlling authority.

Division One discussed Ward's evidence with respect to the first three elements of his necessity defense and determined the evidence was sufficient for those elements. *Id.* at 372-75. Division One then discussed Ward's evidence with respect to the fourth element. Ward offered evidence of his more than 40 years of participation in environmental movements and causes, which had largely failed to address climate change. *Id.* at 375. Ward also submitted proposed testimony from three experts that the fossil fuel industry's influence over political institutions rendered traditional legal avenues unreasonable as a means of addressing the climate emergency. *Id.* The court held, "Whether [the defendant's] evidence was sufficient to establish that his history of failed attempts to address climate change revealed the futility of supposed reasonable alternatives was a question for the jury." *Id.* at 376.

We contrast *Ward* with *State v. Higgins*, 2020 MT 52, 399 Mont. 148, 458 P.3d 1036. Higgins was concerned about climate change, he lobbied legislators, organized rallies, and engaged in civil disobedience to educate the public. But when Higgins entered a pipeline facility, damaged property, and shut off the flow of oil, the State charged him with criminal trespass and felony criminal mischief. He asserted a common law necessity defense. The State filed a motion to prevent him from asserting the defense, and the trial court granted the State's motion. A jury found Higgins guilty. On

14

appeal, Higgins argued the trial court erred by disallowing his common law necessity defense.

The *Higgins* court discussed the common law necessity defense and characterized the fourth element of its necessity defense as "consistent with *United States v. Schoon*, 971 F.2d 193 (9th Cir. 1991)." *Higgins*, 399 Mont. at 153. Similar to Washington, the fourth element is "no reasonable lawful alternatives to breaking the law." *Id.*

With respect to this fourth element, the *Schoon* court discussed two concepts. One concept, indirect civil disobedience, involves violating a law or interfering with a government policy that is not, itself, the object of protest. The other concept, direct civil disobedience, involves protesting the existence of a law by breaking that law or by preventing the execution of that law in a specific instance in which a particularized harm would follow. *Schoon*, 971 F.2d at 196 (citing Note, *Applying the Necessity Defense to Civil Disobedience Cases*, 64 N.Y.U. L. Rev. 79, 79-80 & n.5 (1989)). The *Schoon* court held that the defense of necessity is never available in cases involving indirect civil disobedience. *Id.* at 197.

The Montana Supreme Court reasoned that Higgins, who was not challenging the law of criminal trespass or criminal mischief, had engaged in indirect civil disobedience.

*Higgins*, 399 Mont. at 154-55. It, therefore, concluded that the common law defense of necessity was not available to him. *Id.*

The necessity defense does not apply to persons who engage in civil disobedience by intentionally violating constitutional laws. This is because such persons knowingly place themselves in conflict with the law and, if the law is constitutional, courts should not countenance this. There are always reasonable legal alternatives to disobeying constitutional laws. Examples of reasonable legal alternatives include protests on public property, educating the public, and petitioning elected officials. Should these legal alternatives not produce legislative changes, a protestor still may not engage in criminal conduct. "People are not legally justified in committing crimes simply because their message goes unheeded." *United States v. Montgomery*, 772 F.2d 733, 736 (11th Cir. 1985).

One court persuasively wrote:

The necessity defense was never intended to excuse criminal activity by those who disagree with the decisions and policies of the lawmaking branches of government . . . . [A] court in allowing the defense would be making a negative political or policy judgment about [the current law]. Judgments of that type, however, are not the province of *judge (or jury)* under the separation of powers established by our Constitution.

*United States v. Kabat*, 797 F.2d 580, 591-92 (8th Cir. 1986) (emphasis added).

16

Another court persuasively wrote:

> [A] defendant's legal alternatives will rarely, if ever, be deemed
> exhausted when the harm of which he complains can be palliated by
> political action. . . . While legally sanctioned forms of activism might not
> have achieved an *immediate* halt to [the harm they seek to stop], appellants
> cannot claim they have no legal alternatives merely because their law-
> abiding efforts are unlikely to effect a change in policy as soon as they
> would like. A contrary holding would be tantamount to giving an
> individual carte blanche to interpose a necessity defense whenever he
> becomes disaffected by the workings of the political process.

*United States v. Ayala*, 289 F.3d 16, 26-27 (1st Cir. 2002) (internal quotation marks and

citation omitted).

The dissent suggests that a jury should always decide whether one who violates a

constitutional law should be found guilty. We agree. But a defendant is not entitled to

receive a jury instruction that violating the law is permitted.

> Jury nullification occurs in a trial when a jury acquits a defendant, even
> though the members of the jury believe the defendant to be guilty of the
> charges. This may occur when members of the jury disagree with the
> law . . . or believe that the law should not be applied in that particular case.
> Nullification is a juror's knowing and deliberate rejection of the evidence or
> refusal to apply the law because the result dictated by law is contrary to the
> juror's sense of justice, morality, or fairness.

*State v. Nicholas*, 185 Wn. App. 298, 301, 341 P.3d 1013 (2014). In *Nicholas*, we

concluded that a defendant was not entitled to a jury instruction that allowed him to argue

in favor of jury nullification. We said, "[C]ourts recognize that jury nullification occurs

17

in practice but we will not promote it or educate jurors about nullification." *Id.* Where

reasonable legal alternatives exist so that violating the law is not necessary, a jury

instruction allowing the jury to acquit is tantamount to promoting jury nullification.

At its essence, the question presented is whether a person who desires change in

government policy may abandon reasonable but unsuccessful legal alternatives and adopt

*illegal* alternatives. Our Supreme Court has not answered this question. We answer no.

A person who engages in civil disobedience is not the typical defendant who historically

has been entitled to assert a necessity defense. A person who engages in civil

disobedience is not faced with an emergency and required to quickly choose between a

bad illegal choice and a worse legal choice. Taylor, like other persons engaged in civil

disobedience, intentionally placed himself in conflict with the law. He planned the

protest, knew it violated the law, and proceeded forward. As noted by the *Kabat* court,

the necessity defense was never intended to permit judges or juries to allow people to

ignore constitutional laws. *Kabat*, 797 F.2d at 591-92; *see also* 2 WAYNE R. LAFAVE,

SUBSTANTIVE CRIMINAL LAW: NATURE OF THE DEFENSE OF NECESSITY § 10.1(a) at 158

n.14 (3d ed. 2018) (citing several authorities for the proposition that persons charged with

trespass or obstruction may not assert the necessity defense).

CONCLUSION

Taylor had reasonable legal alternatives to protest the use of railcars to transport coal and oil. He testified about these alternatives. Simply because these alternatives did not bring about legislative change does not permit Taylor to commit crimes or courts to ignore constitutional laws. To the extent *Ward* authorizes people to intentionally violate constitutional laws when protests and petitions are unsuccessful, we disagree with it. We remand to the district court for proceedings consistent with this opinion.

_____
Lawrence-Berrey, J.

I CONCUR:

_____
Pennell, C.J.

19

No. 36506-9-III

FEARING, J. (dissent) —

> *A man may break the words of the law, and yet not break the law itself ... where the words of them are broken ... through necessity.* Reniger v. Fogossa *(1551) 75 Eng. Rep. 1, 32, 31;1 Plowd. 1.*

Accused George Taylor and law professor amici curiae present, in their appellate briefs, a primer on climate change and civil disobedience. In turn, they issue a Jericho trumpeter's call for local and global civic intervention to stall an inexorable increase in carbon emissions and greenhouse gases that precipitate a rise in the earth's temperature and presage a collapse of the planet's ecosystem and human society. Reverend George Taylor, on a more limited scale, seeks to prevent a conflagration resulting from a railroad oil tanker car derailing and to avert the spilling and spewing of grimy coal dust from railroad coal cars while traversing downtown Spokane. But, contrary to Taylor's and the professors' focus, this appeal centers on the banal question of whether an accused possesses a right to present his case to the jury when his facts support a defense under the defense's recognized elements.

The district court correctly ruled that George Taylor presents facts to support the defense of necessity to the charges of trespass and obstructing a train. Any other ruling would violate Taylor's constitutional rights to a jury trial and to the presentation of a complete defense. Therefore, I dissent. I also dissent from the majority's ruling that the superior court judge had no obligation to honor Taylor's notice of disqualification.

Before elaborating on the facts, the procedure, and the law, I first wish to declare what this dissent is not about. This dissent takes no position as to whether George Taylor should be convicted or acquitted of the charges of obstructing a train or of trespassing. The opinion only concludes that a jury should determine Taylor's guilt or innocence.

This opinion also takes no position on whether climate change is occurring, the extent of any occurrence, or humankind's contribution to any climate change. This opinion takes no position as to whether coal or oil trains contribute to climate change or whether oil tankers or coal cars passing through downtown Spokane pose a danger. Nevertheless, this court must accept the facts as presented by Reverend George Taylor and in a light most favorable to him. Those facts support such factual propositions.

Liberals and environmentalists should not deem my dissent and our sister division's recent decision, in *State v. Ward*, 8 Wn. App. 2d 365, 438 P.3d 588, *review denied*, 193 Wn.2d 1031, 447 P.3d 161 (2019), a victory for a progressive agenda. Civil disobedience is color blind at least as to the colors red and blue. Right wing causes are just as amenable as left wing causes to social protest and defiance of law. Cheryl K.

No. 36506-9-III
*State v. Spokane County District Court*

Chumley, Analysis/Opinion, *Civil Disobedience Can End the Coronavirus Stupidity*, WASH. TIMES, Apr. 16, 2020, https://www.washingtontimes.com/news/2020/apr/16/civil-disobedience-can-end-coronavirus-stupidity/. Some liberals only recognize the legitimacy of law breaking as to acts on behalf of liberal causes, while some conservatives deny the rightfulness of civil disobedience by liberals.

In recent weeks, conservatives, to the dismay of many liberals, have protested state governors' social distancing orders resulting from the coronavirus, and President Trump has encouraged disobedience of governors' quarantine orders, if not his own administration guidelines. Andrew Restuccia & Sabrina Siddiqui, *Trump Backs Protests Against Governor's Stay-at-Home Orders*, WALL. ST. J., Apr. 17, 2020; Marty Johnson, *Trump Ally Compares Coronavirus Protestors to Rosa Parks*, THE HILL, Apr. 18, 2020, https://thehill.com/homenews/administration/493484-trump-ally-compare-coronavirus-protestors-to-rosa-parks. Parishioners have attended churches in violation of rules prohibiting congregations from congregating. Danielle Wallace, *Louisiana Pastor Breaks House Arrest to Hold Sunday Service Amid Coronavirus Stay-at-Home Orders*, FOX NEWS Apr. 26, 2020, https://www.foxnews.com/us/louisiana-pastor-house-arrest-stay-at-home-order-coronavirus-tony-spell. Dallas salon owner Shelley Luther defied state pandemic restrictions, after which the Texas Supreme Court ordered her immediate release from jail. Tyler Olson, *Texas Supreme Court Orders Dallas Salon Owner Released as Abbott Bans Jailing Citizens for Lockdown Violations*, FOX NEWS, May 7,

3

2020, https://www.foxnews.com/politics/abbott-issues-executive-order-eliminating-jail-as-punishment-for-violating-coronavirus-restrictions.  In solidarity with Luther, United States Senator Ted Cruz flew from Houston to Dallas for a haircut in Luther's Salon a la Mode.  *Ted Cruz Gets Haircut at Salon Whose Owner Flouted Orders*, AP NEWS, May 8, 2020, https://apnews.com/ef035b6c551b44ad26c7e5da7ff83166.  Some Washington county sheriffs refuse to enforce Governor Jay Inslee's stay-at-home orders in addition to earlier having declined to implement new state gun laws.  Bradford Betz, *Washington County Sheriff Says He Won't Enforce Governor's Stay-at-Home Order*, FOX NEWS. April 22, 2020, https://www.foxnews.com/us/washington-county-sheriff-wont-enforce-governors-stay-at-home-order; Ryan Gados, *Several Sheriffs in Washington State Counties Refuse to Enforce New Gun-Law Measure*, FOX NEWS, February 11, 2019. https://www.foxnews.com/us/sheriffs-in-conservative-counties-in-washington-refuse-to-enforce-new-gun-law.

Before the district court, the State argued, in George Taylor's prosecution, that civil disobedients should accept punishment as part of the act of disobedience, and the State erroneously asserted that Rosa Parks paid her $10 fine and $4 court costs when convicted for her refusal to relinquish her seat on the Montgomery public bus.  This opinion takes no side as to whether George Taylor should willingly accept punishment for violating Washington statutes, and thus this opinion takes no stance in the debate among civil disobedients as to whether the social protestor should willingly submit to his

4

or her punishment as opposed to defending the charges. Some protestors accept punishment under the violated statute as essential to civil disobedience and as a method of drawing further attention to the evil protested. According to this view, jail arouses the conscience of the community over its injustice. The act of civil disobedience is incomplete until the dissident enters prison.

Other civil disobedients deny that they violated the law such that submitting to punishment would be contrary to sound principles. These demonstrators do not challenge the rule of law or the need for an ordered society, but deem a particular law, policy, or practice morally repugnant. Still other lawbreaking protestors refuse to accept the authority of the criminal justice system because of the system's arbitrary rules, discriminatory practices, brutality, and inhumanity.

FACTS

Because we must read the evidence in a light most favorable to George Taylor and draw all reasonable inferences from the evidence, the reader should gain a full picture of the conduct of Taylor and the motivations behind his behavior. The majority opinion misses important subtleties in the facts.

In short, on September 29, 2016, George Taylor, with other members of Veterans for Peace, stood on a BNSF Railway mainline track near the intersection of Trent Street and Crestline Street in the industrial neighborhood of eastern Washington's principal city, Spokane. Taylor refused to step from the track when confronted by a railway police

officer.  He lingered on the track as a means of protesting climate change, the contribution to global warming by BNSF Railway coal and oil train cars, and the proximate danger caused by coal and oil cars lumbering through downtown Spokane.

During a hearing before the district court, George Taylor presented the testimony of three experts and himself, the content of which testimony expands my short synopsis of the facts.  The experts addressed climate change, the danger of oil tankers, and the nature of and success of civil disobedience.  In turn, the State presented the testimony of a BNSF Railway police officer.

Steven Running, a professor of Global Ecology at the University of Montana, testified on behalf of George Taylor.  Running served as a chapter author for the 2014 U.S. National Climate Assessment and as lead author for the Intergovernmental Panel on Climate Change – IPCC Fourth Assessment Report in 2007.  He currently chairs the NASA Earth Science Subcommittee and is a member of NASA's Science Advisory Council.  Running testified, not only about global warming, but warming in Washington State.

According to Professor Steven Running, state climate records show a temperature increase of three-tenths of a degree Fahrenheit in Washington State during each decade since 1950.  Based on current increases of greenhouse gases and carbon emissions and based on average increases in temperature, computer model projections predict

temperatures in Washington State will rise twelve to fourteen degrees Fahrenheit by 2100. The temperature increases will flood the Puget Sound Basin.

Over the last fifty years, according to Steven Running, Washington mountain snowpack has consistently melted earlier in succeeding years. The pack now begins to melt two weeks earlier than it did in 1950. Based on scientific data, Running and other climatologists predict Washington's current summer water runoff levels will decrease by thirty to fifty percent by 2040. Washington rivers will encounter lower flows by the end of each ensuing summer.

Professor Running testified that Washington forests are particularly vulnerable to climate change. The number of forest fires has accelerated dramatically in Washington State. Continuing increases in temperature will double or triple the area burned by forest fires in Washington State. In turn, climate change has caused major forest insect epidemics.

According to Steven Running, if humankind fails to take steps to significantly halt climate change, a stable functioning global society will cease by 2100. Not every human will be dead, but the changes will cause such disruption worldwide that the earth will encounter chaos. Even if the human population now chooses to significantly lower emissions, average temperatures will increase by four degrees by the end of the century, which increase will still cause catastrophic results. Running insists on an overwhelming scientific consensus to the statistics he provided to the district court.

According to Steve Running, from 1970 to 1985, oil caused most carbon emissions. From 1985 to 2005, coal and oil were equal carbon emitters. For the last fifteen years, coal has been the largest carbon emitter because of China's burst in use of coal. China purchases significant amounts of coal from Montana and Wyoming. The coal passes through Spokane on trains during its travel to Pacific harbors.

Fred Millar testified by declaration for George Taylor. Millar is a recognized international analyst in nuclear waste storage and transportation, an expert on industrial chemical use, transportation, and accident prevention, and a planner for emergency responsiveness and homeland security. In his testimony, Millar lamented a lack of adequate preparedness and emergency response protocols to protect public safety in the event of a crude oil train derailment, spill, and explosion. He characterized the damage associated with derailment of trains carrying crude oil as an imminent and grave harm. Governmental accident data and regulatory impact analyses estimate an ongoing, almost monthly, occurrence of United States crude oil releases by railroad derailments, some with oil spills and fires. Some oil and coal car derailments occurred recently in Montana and Oregon and involved trains that traveled through Spokane.

Tom Hastings, an expert on nonviolent resistance and a professor at Portland State University, testified for George Taylor. Hastings opined that civil disobedience brings social change. He presented historic examples such as the Boston Tea Party and nonviolent and unlawful protests for woman's suffrage, the labor movement, and the

iconic African American civil rights movement. Women and minority would not have gained advances in American society without civil disobedience.

Professor Tom Hastings testified that Reverend George Taylor acted in the manner of a quintessential nonviolent civil resister. Taylor acted calmly and peaceably. He acted transparently, cared for other's physical and psychological well-being, and submitted to arrest peacefully. These methods ultimately beget public policy change.

According to Tom Hastings, peaceful civil disobedience is essential to attacking climate change. Our local, state, and national governments refuse to address or even recognize the threat of global warming. Based on the history given by George Taylor to Hastings, Taylor, according to Hastings, had taken reasonable legal alternatives to civil resistance, before September 29, 2016, without success. A nonviolent resister always exerts lawful methods, such as letter writing, lobbying, and imploring government representatives and officials, before engaging in civil disobedience.

Finally, George Taylor testified on his own behalf. Taylor served in the United States Navy for four years. He graduated from Princeton Theological Seminary and served as an ordained minister in the Presbytery Church USA for thirty-six years in five parishes. Taylor currently is the volunteer visitation pastor at All Saint's Lutheran Church in Spokane.

On September 29, 2016, George Taylor, with other military veterans, went to BNSF Railway railroad tracks to bring attention to City of Spokane executive and

9

legislative officers of the imminent danger that coal and oil trains present to city public safety and the present danger that the trains cause to the earth's ecology. Taylor particularly worries about train safety because his granddaughter attends Spokane's Lewis and Clark High School adjacent to mainline railroad tracks of BNSF Railway. One hundred and thirty trains pass through Spokane every day, many of which include coal cars and oil tankers. Taylor frets about a derailment of a car while passing through Spokane. Although he did not identify the location of the spills, Taylor averred that, in the year preceding September 29, 2016, trains derailed seven times.

George Taylor and his September 29 coconspirators intended to stop trains from moving by their standing on the railroad tracks. The group spoke publicly about their intentions when beginning the civil protest. Taylor and his cohorts would have remained standing indefinitely on the railroad tracks if not arrested. Nevertheless, law enforcement arrived within minutes.

George Taylor had earlier attempted other means to affect change with regard to the burning of fossil fuels and the traverse of downtown Spokane by oil trains. He sent letters to United States Senators Maria Cantwell and Patty Murray and United States Representative Cathy McMorris Rodgers. He also went to government offices to advocate the desired changes. He personally visited the office of, called, and sent e-mail to Representative McMorris Rodgers with no response from her. He delivered a petition against the railroad transporting coal and oil personally to the office of Congresswoman

10

McMorris Rodgers.  Taylor always exercises his right to vote, and he votes for "green" candidates.

According to George Taylor, he and other environmental advocates pressured the Spokane City Council to adopt measures precluding the spread of coal dust from coal trains and bolstering the safety of oil tankers to prevent spillage in the event of a derailment.  The City Council declined the demand.  George Taylor participated in a Safer Spokane Initiative that placed on the city ballot a measure affording city government the authority to regulate trains passing through town.  He testified at Army Corps of Engineers hearings on statewide environmental railroad issues.

According to George Taylor, by September 29, 2016, he had exhausted, without success, all legal means to promote environmental change.  Taylor laments that the United States is retreating from cleansing the environment.

George Taylor concluded his testimony by averring that the public danger caused by the trains outweighed the damage caused by his standing on the railroad track.  He deemed his protest on the railroad track necessary to prevent harm.  His protest was an effective, if not the most or only effective, means of producing clean air for his children and grandchildren.  Taylor conceded that his and other's protest on September 29 may not have engendered immediate change, but he insisted that the cumulative effect of protests will provoke beneficial change in environmental policy.  According to Taylor,

11

the environmental movement relies on the combined effect of numerous acts of civil disobedience.

Alan Dryer, a police officer employed by BNSF Railway, testified for the State of Washington. Despite Dryer being an employee of the railroad, the State commissioned him as a law enforcement officer, confirming the public nature of railroads and illustrating the ties between government and railroads beginning with the United States government's granting of free property to railroads and financing of major railroad construction. Civil disobedience often extends to corporations, whose decisions entail serious public consequences.

Alan Dryer, who arrested George Taylor, confirmed that oil and coal trains used the tracks on which Taylor stood. Because of the protest, BNSF Railway stopped train traffic. Dryer could see some of the stopped trains. Spokane serves as a funnel for train traffic, such that the stopping of the trains around the protest site caused a rippling effect, whereby trains outside of Spokane also ceased movement for an hour.

## PROCEDURE

The State of Washington charged George Taylor, in Spokane County District Court, with criminal trespass in the second degree, under RCW 9A.52.080, and obstructing and delaying a train, in violation of RCW 81.48.020. Taylor gave notice to the State of the intent to assert the necessity defense. Taylor, in turn, filed a motion to allow this affirmative defense and to approve the calling of expert witnesses at trial to

12

support the defense. The State objected to the motion and requested that the district court

deny George Taylor the opportunity to present the necessity defense.

After conducting an evidentiary hearing, the district court entered numerous

findings of fact and conclusions of law. The findings included an entry that George

Taylor, on September 29, 2016, believed he had exhausted all legal reasonable means to

effect change. The March 13, 2018, findings and conclusions included an order

authorizing Taylor to present his necessity defense at the upcoming jury trial.

On March 30, 2018, the State of Washington filed, with the Spokane County

Superior Court, an application for a writ of review directed to the district court judge.

The application claimed that the district court erred in authorizing the necessity defense.

The application sought an order reversing the district court. The application also

requested a stay of the pending district court trial until a full hearing before the superior

court on the question of whether the district court erred. The application cited law

concerning the issuance of a writ of review, but no legal argument about any error in the

district court's decision.

On March 30, 2018, the superior court signed an order for issuance of writ of

review and stay of district court proceedings. The order stayed a pending April 20, 2018

trial date.

The State of Washington gave no advance notice to George Taylor or his counsel

when applying for the writ of review. Thus, any hearing for entry of the writ transpired

ex parte. A certificate of service shows that the State mailed the application, motion for

stay, and affidavit in support of the application to George Taylor's counsel on April 2,

2018.

On April 4, 2018, George Taylor filed a notice of disqualification on the superior

court judge who signed the order for writ. The superior court judge denied

disqualification on the basis that he previously issued a discretionary ruling. An order

denying disqualification recognized that the State gave no notice to Taylor's counsel

before the State procured the order for writ of review.

LAW AND ANALYSIS

Superior Court Judge Disqualification

On appeal to this court, George Taylor challenges two court rulings: (1) the

superior court judge's refusal to honor Taylor's notice of disqualification and (2) the

superior court's reversal of the district court's order authorizing presentment of the

necessity defense to the jury. The assertion of these two weighty assignments of error

prolongs this opinion. I first address the notice of disqualification.

RCW 7.16.040 and .050 control the issuance and procedure behind the issuance of

a writ of review. The former statute reads:

> A writ of review shall be granted by any court, except a municipal or
> district court, when an inferior tribunal, board or officer, exercising judicial
> functions, has exceeded the jurisdiction of such tribunal, board or officer, or
> one acting illegally, or to correct any erroneous or void proceeding, or a
> proceeding not according to the course of the common law, and there is no

appeal, nor in the judgment of the court, any plain, speedy and adequate
remedy at law.

In turn, RCW 7.16.050 declares:

The application must be made on affidavit by the party beneficially
interested, and the court may require a notice of the application to be given
to the adverse party, or may grant an order to show cause why it should not
be allowed, or may grant the writ without notice.

Although the statute allows issuance of the writ without notice, RCW 7.16.050 does not

expressly allow ex parte contact between the judge and the applicant when the opposing

party is already represented by counsel.

RCW 4.12.050 controls the disqualification of a superior court judge. The current

version of the statute provides:

(1) *Any party* to or *any attorney appearing in any action* or
proceeding in a superior court may disqualify a judge from hearing the
matter, *subject to these limitations*:
(a) Notice of disqualification must be filed and called to the attention
of the judge *before the judge has made any discretionary ruling* in the case.
. . . .
(2) Even though they may involve discretion, the following actions
by a judge do not cause the loss of the right to file a notice of
disqualification against that judge: Arranging the calendar, setting a date
for a hearing or trial, ruling on an agreed continuance, issuing an arrest
warrant, presiding over criminal preliminary proceedings under CrR 3.2.1,
arraigning the accused, fixing bail, and presiding over juvenile detention
and release hearings under JuCR 7.3 and 7.4.

(Emphasis added.) An earlier version of RCW 4.12.050 controlled at the time of George

Taylor's trespass. That version lacked the language "subject to these limitations." The

current version of RCW 4.12.050 became effective on July 23, 2017, before entry of the

15

order for writ of review and the filing of the notice of disqualification. The parties do not

discuss which of the two versions should apply in this appeal. This court proceeds on the

assumption that the current version controls. I will also.

The State argues that George Taylor filed his notice of disqualification untimely

because Taylor filed the notice after the superior court judge signed the order for a writ of

review. In so arguing, the State ignores the impossibility of Taylor's filing the notice

timely because of the State's own conduct. The State could have given notice to George

Taylor or his attorney before obtaining the superior court judge's signature, but refused to

do so. The State provides no explanation for this failure in courtesy. Under the State's

theory, a party could rush to court and obtain an ex parte order, at the commencement of

the case, from a judge the party knows will favor him or her or from a judge the party

knows that the opposing party will wish to disqualify. The first party can then

intentionally disadvantage the opponent.

I conclude for numerous reasons that the superior court judge erred when refusing

to accept the notice of disqualification. First, George Taylor was not a party to the case,

within the meaning of RCW 4.12.050, when the superior court signed the order for

issuance of a writ of review because Taylor received no notice of the application for the

writ. Second, George Taylor and his legal counsel had not appeared, within the meaning

of RCW 4.12.050, when the superior court judge signed the order for writ, and Taylor

had the right to disqualify one judge on his appearance regardless if the judge earlier

16

issued a discretionary ruling. Third, the State's reading of RCW 4.12.050 would deny a litigant his established right to disqualify one judge of his choice. Fourth, the exceptions to "discretionary rulings" found in RCW 4.12.050(2) echo the nature of the order for issuance of writ such that the order for writ should not be deemed a discretionary ruling. In my analysis, I conflate the first three reasons for concluding that the superior court judge needed to honor the disqualification notice.

A party may, as a matter of right, change judges on the timely filing of a motion and affidavit of prejudice, now a notice of disqualification, against a judge about to hear his cause on the merits. RCW 4.12.040, .050; *State v. Dixon*, 74 Wn.2d 700, 702, 446 P.2d 329 (1968). A party holds the right to one change of a judge without inquiry into the reasons for the change. *Public Utility District No. 1 of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d 339, 349, 797 P.2d 504 (1990). Following the timely filing of notice, the law deems that prejudice exists, and the judge to whom it is directed no longer has authority to act in the matter. *Harbor Enterprises, Inc. v. Gudjonsson*, 116 Wn.2d 283, 285, 803 P.2d 798 (1991).

If the litigant complies with the terms of RCW 4.12.050, the statute removes any discretion as to removal from the superior court judge. *Public Utility District No. 1 of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d 339, 343 (1990). Thereafter, the judge to whom the notice of disqualification is directed is divested of authority to proceed further into the merits of the action. *Marine Power & Equipment*

17

*Co. v. Department of Transportation*, 102 Wn.2d 457, 460, 687 P.2d 202 (1984); *Public Utility District No. 1 of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d at 343.

The right to remove one superior court judge also belongs to new parties brought into ongoing litigation. *Public Utility District No. 1 of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d at 343-44. Even if the superior court judge previously issued a discretionary ruling, a party who appears later in the case may disqualify the judge. *Public Utility District No. 1 of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d at 343. One must be a party to the action in question to waive the right to disqualify the judge who issues a discretionary ruling. *Public Utility District No. 1 of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d at 343.

I discuss numerous Washington decisions in order to accentuate this court's error in affirming the superior court. In *Public Utility District No. 1 of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d 339 (1990), the superior court judge issued a summary judgment ruling favoring the insureds at a time when the wrong insurance company was the named defendant. At the time of the ruling, the proper party insurer knew of the proceedings, agreed to be substituted as a defendant, and attended the summary judgment hearing. Still, the trial court had yet to sign the order of substitution. After being substituted as a defendant, the second insurance company filed an affidavit of prejudice against the judge who issued the summary judgment ruling. The Supreme

18

Court held that the trial court judge committed error when refusing to disqualify himself despite the prejudice to the insureds. The court declared that a party's right to one change of judge takes priority over the orderly administration of justice.

In *State v. French*, 88 Wn. App. 586, 945 P.2d 752 (1997), the State applied to forfeit a bail bond and moved to join the bonding company as a party to the criminal prosecution. The defendant, after being convicted, fled the jurisdiction. After the bonding company entered a notice of appearance, the company filed an affidavit of prejudice against the trial judge. The judge, when entertaining the motion to forfeit the bond, refused to remove himself. This court reversed. Although the trial judge issued discretionary rulings, the bonding company had the right to demand disqualification once the company made an appearance. In a similar vein, George Taylor had the right to demand disqualification of the superior court judge on Taylor's appearance in the suit.

In *State ex rel. Goodman v. Frater*, 173 Wash. 571, 24 P.2d 66 (1933), Jay Allen obtained a judgment against Kitty and J.W. David, after which the superior court judge presided over proceedings supplemental to execution on the judgment. As a result of questioning the judgment debtors, Allen determined that the debtors transferred property to Fannie Goodman and that such property should be subjected to Allen's judgment lien. Allen obtained a show cause order directing Goodman to respond to a claim that she owned property subject to the lien. After being served with the order, Goodman filed an affidavit of prejudice and demanded a change in the judge. The superior court judge

19

refused to reassign the case because he had issued earlier rulings. On review before the Supreme Court, the high court reversed. When Goodman was added to the suit, she had the right to remove one judge. This right could not be denied because the judge already rendered discretionary rulings.

Although George Taylor may have been a named party to the suit at the time that the Spokane County Superior Court judge signed the order of writ, he was not a participating party. He had yet to be served with any process. The State did not bring Taylor in as a party to the suit until after the signing of the order.

In *State ex rel. Jones v. Gay*, 65 Wash. 629, 118 P. 830 (1911), W.M. Jones entered a plea of not guilty on a felony charge. At the arraignment, the superior court judge scheduled a trial date. Later that day, attorney Willett was hired to defend Jones. The following day Willett learned of the plea and the scheduling of the trial date. Two days later, Willett filed an affidavit for change of judge. Willett wanted to disqualify the judge who entered the plea and scheduled the trial date. The judge denied the motion to disqualify.

On petition for a writ of prohibition, in *State ex rel. Jones v. Gay*, the Washington Supreme Court reversed the superior court judge's refusal to remove himself from the proceedings. The Supreme Court might have rested its decision solely on the basis of the order setting the trial date not being a discretionary ruling, but the Supreme Court based its ruling on the ground that W.M. Jones' attorney did not earlier have an opportunity to

file the affidavit of prejudice. Similarly, George Taylor and his counsel had no opportunity to file the notice of disqualification before entry of the order for writ of review.

RCW 4.12.050 precludes the filing of a notice of disqualification by a party already present in the case only if the superior court judge has issued a "discretionary ruling." RCW 4.12.050(2) excludes from the definition of "discretionary rulings" actions that include "[a]rranging the calendar, setting a date for a hearing or trial, ruling on an agreed continuance, issuing an arrest warrant, presiding over criminal preliminary proceedings under CrR 3.2.1, arraigning the accused, [and] fixing bail." The order for the issuance of a writ signed by George Taylor's superior court judge was similar in nature to the examples in RCW 4.12.050(2). The order arranged the calendar, stayed the district court trial, and directed filing of the district court record. All actions constituted preliminary proceedings.

In reviewing the refusal to honor the notice of disqualification, this appellate court does not know the circumstances under which the superior court judge signed the order for writ of review. We do not know whether the State's attorney appeared in person before the judge and argued the merits of the State's position. We do not know if anyone handed the superior court judge the law cited by the State about the issuance of the writ of review and whether the superior court reviewed that law. The record shows that the State handed the superior court no law concerning the necessity defense.

21

In *State ex rel. Mead v. Superior Court*, 108 Wash. 636, 185 P. 628 (1919), a decision on which the superior court relied, the Supreme Court ruled that an order to show cause is a discretionary ruling for purposes of disqualification of a superior court judge. Nevertheless, no Washington court has ruled that the issuance of an order for a writ of review constitutes a discretionary ruling. For all we know, the Spokane County Superior Court judge summarily signed the State's order for issuance of a writ without any weighing of competing factors. Certainly, the State did not afford George Taylor the opportunity to present competing factors so that the court could weigh them and exercise discretion before signing the order for writ.

Although RCW 7.16.050 bestows permission to grant the writ of review without notice, *City of Seattle v. Agrellas*, 80 Wn. App. 130, 136-37, 906 P.2d 995 (1995) holds that the respondent to the writ must receive notice before entry of the writ if the writ implicates speedy trial rights. The writ directed to the Spokane County District Court stayed George Taylor's trial and thereby stalled an impending trial date.

The decisions that I previously outlined were decided by Washington courts before the 2017 amendments to RCW 4.12.050. This court's majority emphasizes language added to RCW 4.12.050 in the 2017 amendments that reads "subject to these limitations," one of which limitations is the issuance of a discretionary ruling. The majority's underscoring of this amending language may imply an understanding that previous case law no longer controls. Based on policy reasons, principles of statutory

22

interpretation, and the legislative history behind the 2017 amendments, I disagree. I further note that, under the previous version of the statute, a party could also not file an affidavit of prejudice after a discretionary ruling, but Washington courts still allowed a party to remove the judge issuing the ruling if the party lacked an earlier opportunity to do so.

The Supreme Court has held that those coming before the court have a fundamental right to an impartial decision-maker and RCW 4.12.050 protects this right, although usually before a discretionary ruling. *Godfrey v. Ste. Michelle Wine Estates Ltd.*, 194 Wn.2d 957, 959, 453 P.3d 992 (2019). Nevertheless, no reason exists to deny this fundamental right when the opposing party gained an ex parte order at the beginning of litigation before one had any notice and an opportunity to file a notice of disqualification.

We must read a statutory amendment in light of earlier case law. *Neil F. Lampson Equipment Rental & Sales, Inc. v. West Pasco Water System, Inc.*, 68 Wn.2d 172, 175, 412 P.2d 106 (1966). In the absence of an indication to change case law, we must assume that new legislation is in line with our prior decisions. *Neil F. Lampson Equipment Rental & Sales, Inc. v. West Pasco Water System, Inc.*, 68 Wn.2d at 176. The 2017 amendments to the statute do not expressly prohibit a new party entering the litigation from disqualifying a judge previously rendering a discretionary ruling.

Legislative history serves an important role in divining legislative intent.

23

*State v. Bigsby*, 189 Wn.2d 210, 216, 399 P.3d 540 (2017).  The 2017 amendments were intended to allow disqualification without creating embarrassment to superior court judges by the allegation of prejudice and to declare what decisions constituted discretionary rulings, not to take a fundamental right away from a litigant.  The Senate Judiciary Committee staff summary of the January 25, 2017 Senate Bill Report for SB 5277 (Wash. 65th Leg. Reg. Sess.) declares:

> This bill is by request of the courts.  It makes it easier for parties to understand what rulings are considered non-discretionary.  Many different types of preliminary hearings are non-discretionary and listing them in this bill clarifies the law and rights of the parties.  Clarity will reduce the motions and costs.  Changing the language in the law from the term "prejudice" to "disqualification" is helpful to the court and parties.  It is more accurate and some parties don't like to use the term prejudice.  *It has no effect on the rights of a party to seek a change of judge*.

(Emphasis added.)

In *Public Utility District of Klickitat County v. Walbrook Insurance Company*, 115 Wn.2d 339 (1990), the high court afforded an added party the right to disqualify a superior court judge who previously made a discretionary ruling.  The Supreme Court focused on the words "any party" found in RCW 4.12.050.  The court held that such language requires that one be a party to the action for the earlier discretionary ruling to preclude the party from removing the judge.  The language "any party" remains in RCW 4.12.050 after the 2017 amendments.

This court determines to resolve the appeal regardless of whether the superior court should have honored the notice of disqualification. I question the ability of this court to do so. On the filing of the notice of disqualification, the superior court judge lacked any authority to render a ruling. *Harbor Enterprises, Inc. v. Gunnar Gudjonsson*, 116 Wn.2d 283, 285 (1991); *State v. Dixon*, 74 Wn.2d 700, 702 (1968). Thus, the superior court's order is null, and this court lacks any ruling to review on the merits.

Necessity Defense

Because this court resolves to address the merits of the appeal regardless of the superior court's authority, I do so also. The superior court also committed error when ruling the district court erroneously authorized George Taylor to present his necessity defense at trial. In affirming the superior court, this appeals court, in turn, rejects an even handed application of the necessity defense and, in particular, component four of the defense, the no reasonable legal alternative element. In affirming the superior court, this court ignores Washington precedent, creates new law, emasculates the meaning of the word "reasonable," endangers the survival of the necessity defense, diminishes a patriotic tradition, overlooks political reality, rejects the moral worth of civil disobedience, discounts the universal need for honorable lawbreaking, shuts the court's ears to the disaffected, usurps the role of the jury, and denies George Taylor the right to a fair trial.

Beginning in 1551, the common law recognized the defense of necessity to criminal charges despite the statute creating the crime admitting no such defense.

25

*Reniger v. Fogossa* (1551) 75 Eng. Rep. 1; 1 Plowd. 1. The necessity defense recognizes that justice and law enforcement are not always coterminous. Therefore, the law excuses an accused's violation of a discrete law when his or her action promotes a greater good for society.

The common law whittled four elements for the necessity defense: (1) the accused acted to avoid a grave harm, (2) the accused did not create the harm by his own conduct, (3) the harm sought to be avoided was greater than that committed, and (4) the accused lacked adequate legal means to avoid the harm. *People v. Gray*, 150 Misc. 2d 852, 853, 571 N.Y.S.2d 851 (1991). Some states now codify the defense and the codifications often add to or vary the common law elements. MODEL PENAL CODE § 3.02 (AM. LAW INST. 1985); COLO. REV. STAT. § 18-1-702; ME. STAT. tit. 17-A, § 103; MONT. CODE ANN. § 45-2-212; N.Y. PENAL LAW § 35.05; OR. REV. STAT. § 161.200; 18 PA. CONS. STAT. § 503; TEX. PENAL CODE ANN. § 9.22.

Washington courts, without legislative approval or ratification, have adopted the common law necessity defense. *State v. Diana*, 24 Wn. App. 908, 913-14, 604 P.2d 1312 (1979). In Washington, the accused may assert the necessity defense when circumstances cause the accused to take unlawful action in order to avoid a greater injury. *State v. Jeffrey*, 77 Wn. App. 222, 224, 889 P.2d 956 (1995). Washington has embraced the four common law elements of the necessity defense. *State v. Vander Houwen*, 163 Wn.2d 25, 31-32, 177 P.3d 93 (2008).

The State of Washington wishes this court to add elements to the common law defense in George Taylor's appeal.  Therefore, I mention some elements added in other jurisdictions, but never adopted in Washington.  A few states require the accused to show he or she sought to avoid an emergency and to avert pending imminent harm.  *State v. Prince*, 71 Ohio App. 3d 694, 595 N.E.2d 376, 379 (1991); *People v. Gray*, 150 Misc. 2d at 853-54; *Egger v. State*, 817 S.W.2d 183, 186 (Tex. App. 1991); *Andrews v. People*, 800 P.2d 607, 609 (Colo. 1990); *State v. Dansinger*, 521 A.2d 685, 688 (Me. 1987).  The Model Penal Code specifically rejects the imminence of harm requirement.  MODEL PENAL CODE § 3.02 cmt. 3.  Anyway, according to one court, the grave harm from pollution is imminent because it occurs every day.  *People v. Gray*, 150 Misc. 2d 852, 862 (1991).

Some American jurisdictions also require the accused to establish the lack of legislative intent to exclude the accused's desired justification under the prosecuted circumstances.  *Commonwealth v. Berrigan*, 325 Pa. Super. 242, 472 A.2d 1099, 1103 (1984), *rev'd*, 509 Pa. 118, 501 A.2d 226 (1985).  Under this element, the defense is not available if, under the circumstances, the defense would conflict with some other provision of the law.  *State v. Clownes*, 310 Or. 686, 801 P.2d 789, 796 (1990).

Finally, some jurisdictions demand that the accused establish a causal connection between his or her conduct and cessation of the harm sought to be averted.  *United States v. Ayala*, 289 F.3d 16, 26 (1st Cir. 2002); *State v. Dansinger*, 521 A.2d at 688 (Me.

1987). Under this element, the action taken must be reasonably expected to avert the impending danger. *People v. Gray*, 150 Misc. 2d at 853-54.

Presumably, the Washington legislature could add elements to the necessity defense beyond the common law elements and even abolish the defense in civil disobedience cases, if not for all prosecutions. Nevertheless, despite the courts adopting the defense with its four elements decades ago, the legislature has taken no action to nullify the defense or add new elements.

George Taylor contends he fulfills all four elements of the Washington formulation of the necessity defense. As to elements one and three, courts generally recognize that the harms perceived by activists protesting environmental hazards far exceed those created by a trespass or disorderly conduct. *People v. Gray*, 150 Misc. 852, 857 (1991). In Taylor's appeal, the State of Washington only challenges the fulfillment of element four of the Washington test. This court's majority and I focus on this element, although I must later respond to the State's attempt to add more elements to the Washington test.

In some formulations of the necessity defense, the Washington courts frame the fourth element as demanding proof that "no" legal alternative exists or as denying the defense when "a legal alternative" subsists. *State v. Jeffrey*, 77 Wn. App. 222, 225 (1995); *State v. Gallegos*, 73 Wn. App. 644, 651, 871 P.2d 621 (1994); *State v. Diana*, 24 Wn. App. 908, 913-14 (1979). In this appeal, the State of Washington impliedly argues

28

that "no legal alternative" must exist, when citing *State v. Diana* and *State v. Gallegos* in its brief. Nevertheless, all courts, even federal courts, soften the element of "no legal alternative" with modifying adjectives such as "effective," "viable," "reasonable," "adequate," or "available." *United States v. Bailey*, 444 U.S. 394, 410, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980); *Commonwealth v. Magadini*, 52 N.E.3d 1041, 1047 (2016); *Muller v. State*, 196 P.3d 815, 816 (Alaska Ct. App. 2008); *People v. Kucavik*, 367 Ill. App. 3d 176, 854 N.E.2d 255, 258, 304 Ill. Dec. 913 (2006); *People v. Gray*, 150 Misc. 2d 852, 853 (1991); *Andrews v. People*, 800 P.2d 607, 610 (Colo. 1990).

According to other jurisdictions, the legal alternative course of action must be "reasonable" to defeat the necessity defense. *United States v. Dorrell*, 758 F.2d 427, 431 (9th Cir. 1985); *People v. Cromwell*, 64 Misc. 3d 53, 104 N.Y.S.3d 825, 830, *appeal denied*, 34 N.Y.3d 979 (2019). As to the element of other legal alternatives, the accused succeeds if he or she establishes that other steps would be "futile." *Commonwealth v. Magadini*, 52 N.E.3d at 1048; *Andrews v. People*, 800 P.2d at 610. The element does not demand that the accused show that he exhausted all conceivable alternatives, only that a jury could reasonably conclude that no alternatives were "available." *United States v. Dorrell*, 758 F.2d at 431 (9th Cir. 1985); *United States v Gant*, 691 F.2d 1159, 1164 (5th Cir. 1982); *Commonwealth v. Magadini*, 52 N.E.3d at 1049. To require the defendant's conduct to be the "sole" alternative to averting the harm would render the defense meaningless. *People v. Kucavik*, 854 N.E.2d 255, 259 (2006).

29

WPIC 18.02, the necessity defense pattern jury instruction, declares the fourth element of the defense to be "no *reasonable* legal alternative existed." *Washington Practice: Washington Pattern Jury Instructions: Criminal* 18.02, at 292 (4th ed. 2016 (WPIC)) (emphasis added). The Washington Supreme Court has impliedly approved WPIC 18.02. *State v. Vander Houwen*, 163 Wn.2d 25, 32 (2008). This court has ruled that, to show the absence of a reasonable legal alternative, the accused can demonstrate that she actually tried the alternative, she lacked time to try the alternative, or a history of futile attempts reveals the illusionary benefits of any alternatives. *State v. Parker*, 127 Wn. App. 352, 355, 110 P.3d 1152 (2005).

Washington law has never directly addressed whether the defendant succeeds by establishing that he believed he held no reasonable legal alternative or whether the jury must find the absence of reasonable, available, effective, and adequate alternatives. One jurisdiction deems the proper inquiry to be whether the defendant "reasonably believed" that there was no legal alternative to his actions. *People v. Gray*, 150 Misc. 2d 852, 865-66 (1991). This rule promotes an objective view because the accused must hold a reasonable belief. The State of Washington contends and the superior court ruled that element four presents an objective standard. I am inclined to agree with the State and superior court, but this agreement is immaterial to the outcome of this appeal.

The State contends that George Taylor presents only his subjective belief that he had no reasonable legal alternative. Even assuming such to be true, the jury could

30

conclude that Taylor's subjective belief was objectively a reasonable belief. Regardless, in addition to stating his belief, Taylor presented to the district court evidence of his many attempts to achieve his goal of ending the transport of oil and gas by railroad tankers and cars and his aim of imposing greater safety measures on the railroad and the lack of any response from government officials. Taylor presented testimony from his witnesses of the need for and effectiveness of civil disobedience in achieving Taylor's goals and the inability to bring change through alternative measures.

The State primarily argues that George Taylor had many other alternatives to civil disobedience as illustrated by his own actions. He could have demonstrated in legal locations. He could have written letters to the editor, sent letters to government officials, and met with his representatives in the state legislature and in the United States Congress.

The superior court adopted the State's contention and ruled that, because a democracy creates legal avenues of protest, alternatives must always exist. This court adopts the superior court's ruling. Such a ruling, however, negates the necessity defense in all civil disobedience cases since the accused can always protest legally, ask the government to change the law or its policies, and file voter initiatives. The ruling could even completely abrogate the necessity defense since the accused could have in advance asked legislators to adopt an exception to a statutory crime to fit his or her later circumstances. For example, a felon accused of unlawfully possessing a firearm when he grabbed a gun from and shot his attacker in self-defense could have earlier requested the

31

legislature to fashion an exception to the crime of unlawful possession of a firearm when possession was needed to preserve one's life. *See State v. Houfmuse*, No. 34394-4-III (Wash. Ct. App. Sept. 5, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/343944_unp.pdf. One might consider this hypothetical absurd because the felon did not know in advance the need to wrest the gun from his attacker, but, for reasons examined later, it is equally nonsensical to require one to futilely and repeatedly beseech the legislature and executive officials to adopt urgently needed measures shunned by the government.

The New York court, in *People v. Gray*, 150 Misc. 2d 852 (1991), presents a rational approach to the fourth element of the necessity defense. In *People v. Gray*, the government charged the accused with disorderly conduct as a result of participating in a demonstration at the Queensboro Bridge in opposition to the opening to vehicular traffic of a lane previously reserved for bicycles and pedestrians during evening rush hours. The government argued that the accused could not assert the necessity defense because he could petition and lobby the Department of Transportation and elected officials to close the lane to vehicles. The court rejected that argument. The accused testified to a long history of attempts to prevent the harm he perceived, including regular consultations with Department of Transportation officials to propose measures to encourage walking, cycling, and the use of mass transit in order to relieve traffic congestion with its accompanying pollution. The accused previously engaged in petitioning, letter writing,

phone calling, leafletting, and lobbying to no avail. Other groups had pressed government officials to comply with the Clean Air Act. The court noted that a history of futile attempts by others will meet the no-legal alternative requirement.

*State v. Ward*, 8 Wn. App. 2d 365 (2019) adopts the teachings of *People v. Gray*. The jury convicted Kenneth Ward of second degree burglary after he entered a Kinder Morgan facility and closed a pipeline valve. The closure stopped the flow of Canadian tar sands oil to refineries in Skagit and Whatcom Counties. Ward sought to protest the continued use of tar sands oil, which he contended significantly contributed to climate change. Ward also sought to remonstrate against inaction by government to meaningfully address a crisis of climate change. The trial court denied Ward the opportunity to present evidence as to his political beliefs and the peril of climate change.

On appeal, in *State v. Ward*, the State argued that Kenneth Ward's offer of proof failed to establish the elements of the necessity defense. The State contended that Ward failed to forward evidence of a reasonable belief that his protest could minimize climate change. According to the State, Ward only inconvenienced the pipeline company. The court responded that Ward did not need to prove that he actually minimized climate change only that the reason he broke the law was in an attempt to minimize the danger.

The State of Washington, in *State v. Ward*, also argued that Kenneth Ward had legal alternatives available. The court answered that Ward offered sufficient evidence to create a question of fact on the availability of reasonable legal alternatives. Ward

testified to the narrowing of the window for action on climate change to the point where the populace needed immediate, emergency action. Ward offered evidence of forty years of experience in various environmental movements, the numerous attempts he exerted to address climate change, and the failure of those efforts. Ward offered testimony by pipeline industry expert Eric de Place, professor and climate campaigner Bill McKibben, and professor of political science Martin Gilens, to the effect that the fossil fuel industry's influence over political institutions renders traditional legal avenues unreasonable as a means of addressing the climate emergency.

Our court's ruling today rejects our sister division's opinion in *State v. Ward* for two foreign decisions: *People v. Higgins*, 2020 MT 52, 399 Mont. 148, 458 P.3d 1036 and *United States v. Schoon*, 971 F.2d 193 (9th Cir. 1991). Neither foreign decision should be followed.

In *People v. Higgins*, the Montana Supreme Court ruled that that the Montana legislature had codified the necessity defense into a defense entitled compulsion, not necessity. MONT. CODE ANN. § 45-2-212. The statute severely limited the necessity defense from its common law articulation. The statute required the defendant to show he acted "under the compulsion of threat or menace of the imminent infliction of death or serious bodily harm." Civil disobedience obviously does not comport with the Montana statute.

In *United States v. Schoon*, 971 F.2d 193 (9th Cir. 1991), the federal Court of Appeals announced an awkward and unworkable distinction between "indirect civil disobedience" and "direct civil disobedience." The court purportedly saved the necessity defense for direct civil disobedience and barred the defense in indirect civil disobedience cases. The court defined "direct civil disobedience" as violating the law or preventing the execution of the law that constitutes the subject of the protest. "Indirect civil disobedience" involves violating a law or interfering with a government policy that is not itself the object of the protest. *Schoon* is not good precedent to follow by Washington courts because all federal courts, unlike Washington and other state courts, narrow the necessity defense from its common law parameters. Also, the Ninth Circuit announced a decision on an issue never briefed by the parties.

This court promotes the *Schoon* court's distinction of indirect and direct civil disobedience, but then ignores the distinction and rules that George Taylor had other alternatives to protesting. This court then holds that civil disobedience, even direct civil disobedience, can never provide a defense because alternatives to protesting always exist. The Ninth Circuit, in *United States v. Schoon*, similarly abandoned its distinction when ruling that the civil disobedient, Gregory Schoon, showed no cognizable harm when protesting United States policy in Central American because congressional action authorized the American policy of providing financial aid and military support to

35

paramilitaries in El Salvador and the accused could seek congressional change. The *Schoon* court's reasoning would also apply to direct civil disobedience.

I now return to this appeal's facts to assess whether George Taylor failed as a matter of law to show the lack of other reasonable legal alternatives to avert the harm. When addressing the sufficiency of evidence for purposes of asserting a defense to the jury, this court must view the facts in favor of Taylor. *State v. Ward*, 8 Wn. App. 2d 365, 372-73 (2019). In its brief, the State cites a newspaper article about recent events in support of its version of the facts. Therefore, in addition to reviewing district court testimony, I cite articles that confirm Taylor presented sufficient facts that, if believed, fulfilled the fourth element of the necessity defense.

The State emphasizes that George Taylor could seek political change through proselytizing government officials and proposing voter initiatives. In fact, Taylor's district court testimony mentioned the Safer Spokane coal and oil train initiative that he and others promoted. The initiative, Spokane Proposition 2, would have imposed a $261 fine on the owner of each rail car containing an uncovered coal shipment or containing oil that had not been treated to reduce vapor pressure at flashpoint. Kip Hill, *Spokane Voters Reject Fines for Coal, Oil Trains Traveling through Downtown*, Spokesman Rev., Nov. 7, 2017, https://www.spokesman.com/stories/2017/nov/07/spokane-voters-reject-fines-for-coal-oil-trains-tr/. In November 2017, Spokane citizens voted to reject the initiative. Hill, *supra*. The Committee to Protect Spokane's Economy, a political group

funding the effort to defeat the measure, raised $264,000, most of which came from

BNSF Railway contributions. Hill, *supra*. By comparison, Taylor's committee, Safer

Spokane, raised $7,000, which came from individual donors. Hill, *supra*. The defeat of

the initiative reinforces Taylor's evidence of the lack of viable alternatives for him.

When arguing that George Taylor possessed other reasonable legal alternatives to

gaining his political goals, the State assumes that all persons have equal access to

government officials and equal ability to influence public policy and laws. Of course, the

truth lies elsewhere. Our court's reasoning that the accused always possesses the

alternative of cajoling elected representatives and government officials also shows

sightlessness to the realities of the political process. All candidates and office holders,

regardless of party affiliation, will meet with and listen to large donors, not pensioner

military veterans or retired ministers lacking a largesse. Money buys access to power.

George Taylor's congresswoman refuses to respond to him.

The opponents of the Safe Spokane initiative, mostly large corporations, raised

thirty-seven times the amount of money as George Taylor and his colleagues. The

money purchased advertisements that promoted fears spread by BNSF Railway and its

benefactors. In addition to purchasing politicians, the rich can buy advertisements in

newspapers, purchase radio and television time, and rent billboard space.

An ineffective method of procuring change is an unreasonable alternative to civil

disobedience, and, according to George Taylor's evidence, contacting legislators and

filing initiatives to adopt measures combating climate change has been ineffective. This court's instruction to Taylor to continue with lobbying efforts parallels Zeus' dictate to Sisyphus to forever roll a boulder up a hill in Hades.

I now respond to the State of Washington's advocacy to add other elements to Washington's necessity defense. In addition to arguing that George Taylor lacked evidence of no reasonable legal alternative, the State contends George Taylor presented no facts that his trespass on railroad property will lower carbon emissions or will avoid the greater harm of climate change. The State uses a recent newspaper article that reports China's building of an insane number of coal fired plants such that Taylor's civil disobedience could not have any impact on global warming.

Washington State does not require causation as an element in establishing the necessity defense. Anyway, George Taylor forwarded sufficient testimony for a jury to consider causation even if Washington adopted this element. In addition to presenting evidence from expert witnesses of the chaotic world our descendants face, one expert talked about the efficacy of civil disobedience in bringing policy and social change. Whereas Taylor may be unable to directly influence Chinese government policy, his protests could prevent shipment of coal to China and provide an example for protests of potential activists in China.

The State of Washington's argument about causation assumes that the protesting defendant must show that his protest alone will render change. This position fails to

recognize the expansive impact of numerous small protests throughout the nation, if not the world. Every protest plays a role in social change. One protest begets other protests.

The State of Washington also contends that George Taylor presented no evidence that his trespass blocked oil trains. Once again, Washington does not have a causation element to the necessity defense. Anyway, the record contains evidence of many trains in the environs of Spokane being stopped because of Taylor's actions. Taylor would have continued to obstruct trains indefinitely had he not been arrested.

The State asserts that George Taylor presented no evidence of a possibility of a train derailment or explosion in Spokane. Nevertheless, Taylor and Fred Millar referred to derailments of trains that passed through Spokane.

The Spokane City Council approved sending the oil tanker initiative, Proposition 2, to the voters after a catastrophe in Mosier, Oregon, following the fiery derailment of a train carrying crude oil that had passed through downtown Spokane hours earlier. Hill, *supra*. On June 3, 2016, a Union Pacific train with ninety-six tank cars carrying Bakken oil from North Dakota to U.S. Oil and Refining in Tacoma derailed in the Columbia River Gorge near Mosier. 42,000 gallons of oil spilled. Several cars caught fire after large explosions in tanker cars, despite all of the tanker cars being of standard modern design. Twenty government agencies responded to the fire. Mosier residents were evacuated, and the town sewage treatment plant closed. An oil sheen formed on the Columbia River. *Oregon Train Derailment Spills Oil, Sparks Fire*, WJTV.COM, June 3,

39

2016, https://www.wjtv.com/news/oregon-train-derailment-spills-oil-sparks-fire/966700802/; Andy Giegerich, *In Mosier, Angry Residents, Complicated Tasks Ahead*, PORTLAND BUS. J., June 9, 2016, https://www.bizjournals.com/portland/morning_ call/2016/06/in-mosier-angry-residents-complicated-tasks-ahead.html; Aaron Mesh, *Oil Train Spilled 42,000 Gallons of Crude Oil in Columbia River Gorge Crash*, WILLAMETTE WK., June 6, 2016, https://www.wweek.com/news/2016/06/06/oil-train-spilled-42000-gallons-of-crude-in-columbia-river-gorge-crash/.

In 2015, a train derailment in rural eastern Montana spilled 35,000 gallons of crude oil and forced the evacuation of thirty people. In 2013, the derailment of an oil train in Lac-Megantic, Quebec, flattened the city's downtown and killed forty-seven people.

This appeal holds ramifications beyond the necessity defense, which ramifications impact fundamental and critical constitutional rights. United States Constitution Sixth Amendment and Washington Constitution article I, section 22 preserve a right to a jury trial to the accused. *Duncan v. Louisiana*, 391 U.S. 145, 155-56, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968); *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Both the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 21 and 22 of the Washington Constitution guarantee an accused the right to present a defense. *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006); *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). When

reading the constitutional protections together, the trial court must afford an accused a meaningful opportunity to present a complete defense to a jury. *Holmes v. South Carolina*, 547 U.S. at 324; *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State v. Ward*, 8 Wn. App. 2d 365, 370-71 (2019).

The constitutional right to present a defense extends to the right to call witnesses on one's behalf. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State v. Smith*, 101 Wn.2d 36, 41, 677 P.2d 100 (1984). An accused possesses a fundamental right to present defensive evidence so long as such evidence is relevant and not excluded under an evidentiary rule. *Washington v. Texas*, 388 U.S. at 23. The right to present evidence and call witnesses extends to the necessity defense. *State v. Ward*, 8 Wn. App. 2d at 371-72.

By its ruling, this court ignores the critical role of juries in the American legal system. This court instead concludes that judges, not jurors, should decide the presence of no reasonable legal alternative to civil disobedience. According to this court, judges know best as to whether civil disobedience may ever be reasonable in advocating social change.

Judges should be the last persons to decide the viability of civil disobedience within the rubric of the necessity defense. A judge assumed and keeps his or her position by conforming to societal norms and befriending and flattering others in power. A judge campaigns for office on a platform of law and order, not disobedience and discord. A

41

judge wishes to protect the status quo, which inevitably benefits him or her. The demonstrator annoys a judge because the protestor clogs the court system with moralistic ranting. My first reaction as a judge to George Taylor's appeal was: don't plague me with your whining about being charged with a crime resulting from your petty, inconsequential trespass on some isolated railroad track in support of your bleeding heart sympathies.

By its ruling, this court usurps a jury's role in determining what constitutes reasonable behavior. This court holds that, as a matter of law, petitioning government officials or legislative representatives is always a "reasonable" method of averting harm. Nevertheless, the law particularly leaves to jurors the question of "reasonableness." *Stephens v. Omni Insurance Co.*, 138 Wn. App. 151, 170, 159 P.3d 10 (2007), *aff'd sub nom. Panag v. Farmers Insurance Co. of Washington*, 166 Wn.2d 27, 204 P.3d 885 (2009). Stated differently by another court, assessing what is reasonable in any given set of circumstances will give rise to a jury question. *Towe v. Sacagawea, Inc.*, 357 Or. 74, 347 P.3d 766, 778 (2015).

This court's modification of established Washington law and imposition of new restrictions on the necessity defense represent a significant change in public policy that should be reserved for the state legislature or the Washington Supreme Court. This court's ruling, for the first time in Washington State, brands all civil disobedience as objectionable and worthy of punishment. This court thereby ignores the rich American

history, beginning with our Revolution, of honorable lawbreaking. This court also overlooks the universal and compelling nature of civil disobedience in altering social practices and government policy.

Political dissent and protest gave birth to the United States. Revolutionary colonists engaged in civil disobedience over King George III's tariffs when dumping tea in Boston's harbor. The Tea Party initiated continuous acts of disobedience by patriots. After the creation of the United States, civil disobedience precipitated necessary change when appeals to the government went unanswered. Suffragettes and desegregationists risked and gave their lives, while awakening a nation to their righteous causes through civil disobedience.

This court's viewpoint would punish African-American student protestors arrested and charged with trespassing after they sat at the Greensboro F.W. Woolworth segregated lunch counter. After all, the students could press the all-white Greensboro City Council to adopt laws requiring desegregation in public places of business. This court's ruling would return a fugitive slave to an angry and vengeful master because the slave or the slave's white abetter could petition the United States Congress to repeal the Fugitive Slave Act. This court's ruling protects the property rights of an over ground railroad, but denies the validity of an underground railroad.

One might suggest that my slave example is extreme, but, if we take the evidence in the light most favorable to George Taylor, his cause is also extreme. According to the

evidence presented by Taylor, climate change will wreak global havoc, if not destroy human existence on earth, unless humankind takes immediate action.

Instead of recognizing the legitimacy of civil disobedience, this court sides with the detractors of civil disobedience, who demand from their government strict application of endless laws. The opponents of civil disobedience fear disorder, if not chaos, being unleashed on society. History disproves this fear. Few people violate the criminal law out of conscience and to achieve a higher goal. Instead, the cost of defending oneself, the inconvenience of the criminal prosecution process, the scorn received from polite society and government officials, and the potential punishment on conviction limit instances of civil disobedience.

Adversaries of civil disobedience also worry that the necessity defense will promote fraud. To the contrary, no historic example confirms the use of the necessity defense by one who did not truly believe in the proffered cause.

The question of whether to allow the necessity defense in the context of civil disobedience strikes at the heart of American society and its justice system. According to its critics, the necessity defense for civil disobedience sanctions departures from legality and encourages private determinations of law. The nation should be governed by laws, not men and women, and those laws should be made through representatives chosen by the majority. The accused's professed unselfish motivation in violating the law, rather than a justification, identifies a form of arrogance that organized society cannot tolerate.

But the civil disobedient does not ask to be a law unto himself or herself. Instead, the remonstrator submits his or her case to the jury, sitting as the conscience of the community, and the disobedient's peers decide whether he or she made an objectively correct choice of values. George Taylor's Spokane County jury could conclude that Taylor did not seek the lesser of two evils or that he had a reasonable alternative to trespass and obstruction.

The necessity defense for civil disobedients does not engender limited lawlessness. Instead, the defense provides an essential safety valve to vent frustration in a democratic and libertarian society. The necessity defense allows the airing of views by those most in need of a hearing, those frustrated by the workings of the political system and those lacking representation in the halls of legislative bodies. Recent events confirm the need for courts to listen to unheard voices.

The stone and steel of criminal statutes can afford to bow on occasion in order to promote justice. A skyscraper that cannot bend with the wind eventually collapses.

John Wycliffe, Jan Hus, Martin Luther, Thomas More, Galileo Galilei, Anne Hutchinson, Roger Williams, Thomas Paine, John Brown, Harriet Tubman, Saad Zaghloul, Susan B. Anthony, Emily Davison, Emmeline Pankhurst, Dorothy Day, Mohandas Gandhi, Evelyn Thomas Butts, Martin Luther King, Jr., Nelson Mandela, John Lewis, Joseph McNeil, Steven Biko, Muhammed Ali, Russell Means, Andrei Sakharov, Aleksandr Solzhenitsyn, Larry Kramer, Lech Walesa, Vaclav Havel, Liu Xiaobo, the

45

anonymous rebel in Tiananmen Square, and the Estonian singers, along with innumerable lesser known or anonymous dissidents constructively influenced history with civil disobedience. One might draw an inference from this appeal's facts that someday history will add George Taylor and scores of his coconspirators to the roll call of honorable lawbreakers who precipitated political transformation. In resolving this appeal, this court must only draw reasonable inferences from the facts before it, and I cannot predict or discern if such an inference is reasonable. I pray, however, for the sake of my grandchildren and great-grandchildren, that the inference becomes a reality.

_____
Fearing, J.